Shirley FERRILL, Plaintiff-Appellee,

v.

THE PARKER GROUP, INC., Defendant-Appellant.

No. 97-7013.

United States Court of Appeals,

Eleventh Circuit.

Feb. 26, 1999.

Appeal from the United States District Court for the Northern District of Alabama. (No. CV-96-AR-2175-S), William M. Acker, Jr., Judge.

Before BIRCH and BARKETT, Circuit Judges, and ALAIMO[*], Senior District Judge.

ALAIMO, Senior District Judge:

Appellant, The Parker Group, Inc. ("TPG"), appeals the District Court's order granting summary judgment to plaintiff-appellee, Shirley Ferrill, on Ferrill's claim of race discrimination in job assignment in violation of Title 42 of the United States Code, section 1981. TPG argues that the District Court erred in finding TPG liable under § 1981 despite the District Court's finding that TPG had no racial animus. TPG also appeals the jury award of compensatory and punitive damages.

Because this appeal involves the grant of a motion for summary judgment, we review the facts in the light most favorable to TPG, the non-moving party on this motion.

I.

TPG is a telephone marketing corporation, often hired to perform work for political candidates. The conduct at issue in this case involves TPG's work making "get-out-the-vote" calls for various political candidates preceding the November 1994 election. About 60% of TPG's overall business is pre-election "get-out-the-vote" calling. Approximately 10% of such calling is race-matched, such that black voters are called by black TPG employees who use the "black" script, while white voters are called by white TPG

[*]Honorable Anthony A. Alaimo, Senior U.S. District Judge for the Southern District of Georgia, sitting by designation.

employees who use a different, "white" script.[1]   Race-matched calling apparently is used only when specifically requested by customers.  TPG employees doing the race-matched calling in 1994 were assigned separate calling areas and separate scripts according to race.  To facilitate supervision, TPG also physically segregated employees who worked at race-matched calling.[2]  Black callers were segregated into one room, and white callers segregated into another.[3]

Ferrill, an African-American woman, was hired as a temporary employee to fill TPG's pre-election staffing needs from September through November 1994.[4]  She worked primarily on Jim Folsom's gubernatorial campaign, making race-matched "get-out-the-vote" calls.  Ferrill was laid off during a "reduction in force" ("RIF") immediately after the election.

---

[1]TPG apparently also tries to match other characteristics.  For example, TPG claims that it attempts to match callers with Midwestern accents with Midwestern voters.

[2]TPG asserts that it has now abandoned the practice of physical segregation.  Through use of computers and other technological innovations, it is now possible to supervise callers effectively even if callers on different projects work side by side.

[3]TPG's building contains two calling areas.  The main room is larger and, according to some callers, more comfortable than the smaller annex room.  There is some disagreement on the relative merit of the two rooms the larger room, for example, was noisier.  Sometimes black callers used the main room;  at other times, black callers used the annex room.

[4]Ferrill was not a TPG employee, but rather was employed by a temporary placement agency.  Thus, she was precluded from suing TPG under Title VII.

Ferrill filed this action under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991,[5] alleging race discrimination in her termination and job assignment. Ferrill and TPG filed cross-motions for summary judgment. The District Court granted TPG's Motion for Summary Judgment on the unlawful termination claim because Ferrill failed to rebut TPG's proffered legitimate nondiscriminatory reason for the termination, namely, a RIF. The District Court granted Ferrill's Motion for Summary Judgment on the unlawful job assignment claim. TPG appeals this grant of summary judgment to Ferrill.

After granting Ferrill's Motion for Summary Judgment and finding TPG liable on the unlawful job assignment claim, the District Court struck a jury to decide damages. The jury awarded Ferrill $500 in compensatory damages and $4000 in punitive damages. TPG also appeals this award of compensatory and punitive damages.

II.

Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts. *See, e.g., Johnson v. Railway Express Agency,* 421 U.S. 454, 459-460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975) (holding unequivocally that § 1981 protects against racial discrimination in private employment). Section 1981 liability must be founded on purposeful discrimination. *See General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 389, 102 S.Ct. 3141,

---

[5]Section 1981 states:

> (a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

> (b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

> (c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

3149, 73 L.Ed.2d 835 (1982); *Lincoln v. Board of Regents of Univ. System of Ga.,* 697 F.2d 928, 935 n. 6 (11th Cir.1983).

A showing of disparate impact through a neutral practice is insufficient to prove a § 1981 violation because proof of discriminatory intent is essential. *See General Bldg. Contractors Ass'n,* 458 U.S. at 388, 102 S.Ct. at 3149 (recognizing that the drafters of § 1981 were not concerned with practices that were facially neutral); *Lincoln,* 697 F.2d at 935 n. 6. Accordingly, only direct or inferential modes of proving intentional discrimination are available to the § 1981 plaintiff. *See Larkin v. Pullman-Standard Div., Pullman, Inc.,* 854 F.2d 1549, 1561 (11th Cir.1988), *overruled on other grounds by Swint v. Pullman-Standard, Inc.,* 493 U.S. 929, 110 S.Ct. 316, 107 L.Ed.2d 307 (1989) (where plaintiff proceeded on a theory of disparate impact, plaintiff is limited to Title VII and cannot seek the broader § 1981 remedies and longer liability period). *Cf. Stallworth v. Shuler,* 777 F.2d 1431, 1433 (11th Cir.1985) (where plaintiff claims *only* disparate treatment under both Title VII and § 1981, courts may analyze claims together).

The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377-78, 105 L.Ed.2d 132 (1989). An employee who adduces direct evidence of disparate treatment on the basis of race makes out a prima facie case of intentional discrimination. The burden of persuasion then shifts from the employee to the employer, who must rebut the direct evidence of discrimination by affirmatively proving that it would have made the same decision even if it had not taken race into account. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 242, 109 S.Ct. 1775, 1786, 104 L.Ed.2d 268 (1989).

TPG has admitted that the 1994 assignments of "get-out-the-vote" calls and scripts were made on the basis of race and that TPG employees were segregated on the basis of race.[6] TPG's admission is direct evidence of disparate treatment on the basis of race and sustains Ferrill's prima facie case. The District Court

---

[6]TPG so stipulated in the Pretrial Order.

4

relied on that unrebutted evidence to find TPG liable for intentional race discrimination in job assignments in violation of § 1981.

Implicit in the District Court's finding is the notion that racial animus and intent to discriminate are not synonymous.[7] In its Memorandum Opinion, the District Court stated that there is "no evidence" that TPG acted with any racial animus. The crucial issue then is whether a defendant who acts with no racial animus but makes job assignments on the basis of race can be held liable for intentional discrimination under § 1981. Clearly, the answer is yes.

In *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), the Supreme Court faced this very issue. In *Goodman,* union members sued their union for intentionally failing to assert race discrimination claims against the employer. The Court found that "there was no suggestion that the [defendant] held any racial animus against or denigrated blacks generally," *id.* at 668, 107 S.Ct. at 2625, but found the defendant liable for racial discrimination under § 1981 regardless of whether the union leaders were favorably disposed toward minorities. *Id.* at 669, 107 S.Ct. at 2625. The *Goodman* Court clearly held that liability for intentional discrimination under § 1981 requires only that decisions be premised on race, not that decisions be motivated by invidious hostility or animus. *Id.*

III.

Discrimination in employment on the basis of protected traits such as sex, religion, age, national origin, or race, may be permissible in at least three circumstances. First, disparate treatment on the basis of religion, sex, or national origin is allowed where a particular religion, sex, or national origin is deemed a qualification reasonably necessary to the functioning of a business (a "bona fide occupational qualification"). Secondly, facially neutral employer practices that disparately impact protected classes may be justified by "business necessity." Finally, under the aegis of "affirmative action," employers may engage in disparate treatment in favor of a protected class for the purpose of remedying past discrimination.

---

[7]In other words, ill will, enmity, or hostility are not prerequisites of intentional discrimination.

5

An employer may intentionally discriminate "on the basis of ... religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise...." 42 U.S.C. § 2000e-2(e)(1). The bona fide occupational qualification ("BFOQ") defense is an extremely narrow exception, *see, e.g., Dothard v. Rawlinson,* 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977); EEOC Guidelines, 29 C.F.R. § 1604.2 (referring to BFOQ for gender), and is *not* available for racial discrimination. *See Miller v. Texas State Bd. of Barber Exam'rs,* 615 F.2d 650, 652 (5th Cir.1980)[8] (acknowledging that race is "conspicuously absent" from the statutory language); *Swint v. Pullman-Standard,* 624 F.2d 525, 535 (5th Cir.1980), *overruled on other grounds by* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (professing court's belief that the omission of race and color as BFOQs was deliberate and intentional on the part of Congress and holding that the BFOQ defense is not available in race discrimination cases); *Burwell v. Eastern Air Lines, Inc.,* 633 F.2d 361, 370 n. 13 (4th Cir.1980) (statutory BFOQ defense is not available for facial race discrimination in employment); *Knight v. Nassau County Civil Serv. Comm'n,* 649 F.2d 157, 162 (2d Cir.1981) (same). Because § 1981 proscribes discrimination solely on the basis of race, and the BFOQ defense does not apply to racial discrimination, the BFOQ defense is never available to the § 1981 defendant.

An employer may assert "business necessity" as a defense to claims that facially neutral employment practices have discriminatory effects. The business necessity defense originally had no textual basis but evolved primarily from *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), as a defense to claims that facially neutral employment practices have discriminatory effects. In 1991, Congress codified the business necessity defense as articulated by the Court in *Griggs. See* 42 U.S.C. § 2000e-2(k). When a facially neutral practice is challenged for its disparate impact, an employer need not assert a BFOQ

---

[8]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

for justification, but may argue instead that the practice is grounded in a legitimate, job-related purpose.[9] *See, e.g., International Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 198-200, 111 S.Ct. 1196, 1203-04, 113 L.Ed.2d 158 (1991) (noting different applications of BFOQ and business necessity defenses and holding that the business necessity defense, and not the BFOQ defense, is the appropriate standard for disparate impact cases). Because § 1981 liability must be grounded on intentional discrimination, *see General Bldg. Contractors Ass'n,* 458 U.S. at 389, 102 S.Ct. at 3149, and the neutral practice mode of proof is inapposite in § 1981 cases, the business necessity defense is not available to the § 1981 defendant. *See also* 42 U.S.C. § 2000e-2(k)(2) (making explicit that "a demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination ... ").

In sum, then, it is clear that the BFOQ and business necessity defenses are not available to a defendant who, like TPG, is accused of intentional discrimination on the basis of race in violation of § 1981.[10]

---

[9]Both the BFOQ and business necessity defense are defenses but a BFOQ is a warrant for affirmative deliberate discrimination while a business necessity defense is a defense to the prima facie case made when an apparently neutral employment practice is shown to have a discriminatory effect. The difference between the two defenses is demonstrated in *Dothard,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786, which involved a Title VII challenge to one employment policy based expressly on sex and another which was facially neutral but which had a disparate impact on women. The Court considered only the BFOQ defense in assessing the legality of the facially discriminatory policy and only the business necessity defense for the facially neutral policy.

[10]The District Court expressed some concern that its decision "might well prevent advertisers from employing, based on race, actors to solicit products to a certain group." This conclusion, however, does not necessarily follow. A film director casting a movie about African-American slaves may not exclude Caucasians from the auditions, but the director may limit certain roles to persons having the physical characteristics of African-Americans. Indeed, the drafters of Title VII expressly anticipated this issue. In their interpretative memorandum, Senators Case and Clark explained that

> [a]lthough there is no exemption in Title VII for occupations in which race might be deemed a bona fide job qualification, a director of a play or movie who wished to cast an actor in the role of a Negro, could specify that he wished to hire someone *with the physical appearance* of a Negro.

110 Cong. Rec. 7213, 7217 (1964) (emphasis added). *See also Miller,* 615 F.2d at 654 (suggesting that a director wishing to cast the role of Henry VIII may announce that only applicants of sufficient physical likeness to Henry VIII will be considered). As applied here,

7

Neither is Title VII's "affirmative action" exception available to TPG. Although discrimination to remedy the effects of past discrimination is permitted under Title VII,[11] and this defense is available to the § 1981 defendant,[12] the defense is not applicable to the case at bar. Ferrill's assignment to call African-Americans "was not affirmative action, or benign discrimination, intended to correct racial imbalance. Rather, it was based on a racial stereotype that blacks" would respond to blacks and "on the premise that [Ferrill's] race was directly related to her ability to do the job." *Knight,* 649 F.2d at 162.[13]

IV.

Recently, the Seventh Circuit adopted a narrow, judicially-crafted racial BFOQ in *Wittmer v. Peters,* 87 F.3d 916 (7th Cir.1996). In *Wittmer,* white boot camp correctional officers denied promotions to lieutenant sued for race discrimination in violation of the Equal Protection Clause. Applying strict scrutiny, the Seventh Circuit held that preference given to a black applicant on the basis of his race did not violate equal protection because expert evidence suggested that black boot camp inmates would not participate in the correctional game of "brutal drill sergeant" unless there were some black officers in authority positions at the camp. *Id.* at 920. Subsequently, in *McNamara v. City of Chicago,* 138 F.3d 1219 (7th Cir.1998), the

---

TPG could have legally assigned jobs based on accent, speech pattern or dialect, but not expressly on race.

Although the statutory language allows gender to be a valid BFOQ for hiring an actor or actress where it is necessary for the "purpose of authenticity or genuineness," *see* 29 C.F.R. § 1604.2(a)(2), Congress specifically rejected race as a BFOQ. *See generally* 110 Cong. Rec. 2550-63 (1964) (House discussion on inclusion of race and color in the BFOQ exception).

[11]*See, e.g., United Steelworkers of America, AFL-CIO-CLC v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979) (holding that a race-conscious affirmative action plan was a permissible temporary measure designed to eliminate a pre-existing manifest racial imbalance).

[12]*See Brown v. American Honda Motor Co. Inc.,* 939 F.2d 946, 949 (11th Cir.1991) (citing *Patterson,* 491 U.S. at 185-87, 109 S.Ct. at 2377-78, for the proposition that claims under section 1981 and claims under Title VII are evaluated under the same principles).

[13]"No matter how laudable [an employer's] intention might be ... the fact remains that [an employee] was assigned a particular job (against [her] wishes) because [her] race was believed to specially qualify [her] for the work. This is a violation of Title VII." *Knight,* 649 F.2d at 162.

Seventh Circuit declined to extend this racial BFOQ to firefighters because there was no compelling evidence that white firefighters could not be effective as firefighters. *Id.* at 1222.

Although two cases from the former Fifth Circuit suggest in dicta that such a defense may be justified in certain circumstances, this circuit has never adopted a racial BFOQ. In *Baker v. City of St. Petersburg,* 400 F.2d 294 (5th Cir.1968), the former Fifth Circuit suggested that race may be considered for "the undercover infiltration of an all-Negro criminal organization or plainclothes work in an area where a white man could not pass without notice. Special assignments [on the basis of race] *might* also be justified during brief periods of unusually high racial tension." *Id.* at 301 n. 10 (emphasis added). Similarly, in *Miller,* 615 F.2d 650, the former Fifth Circuit stated that a "business necessity defense may also be appropriate in the selection of actors to play certain roles," *id.* at 654, but explicitly recognized that "the black on black assignments tentatively approved in *Baker* may be prohibited unless a business or similar exception is recognized for such intentional discrimination." *Id.* at 653. No such business or similar exception has been recognized by this Circuit, and we decline to do so today.

V.

TPG raises for the first time on appeal their argument that their practice of using race-matched calling is political speech protected by the First and Fourteenth Amendments. Specifically, TPG argues that its clients, political candidates, should be able to choose the particular mode of political expression, i.e., race-matched get-out-the-vote calling.

"As a general principle, this court will not address an argument that has not been raised in the district court." *Stewart v. Department of Health and Human Servs.,* 26 F.3d 115 (11th Cir.1994) (citing *Baumann v. Savers Fed. Sav. & Loan Assoc.,* 934 F.2d 1506, 1510 (11th Cir.1991)). *See also Bliss v. Equitable Life Assur. Soc. of U.S.,* 620 F.2d 65, 70 (5th Cir.1980) (judicial economy is served by binding parties to the theories raised in the lower court); *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (recognizing the general rule that a federal appellate court does not consider an issue presented

9

for the first time on appeal). TPG advances no persuasive argument to deviate from this general rule. Thus, because TPG did not present a First Amendment argument in the district court, we decline to consider this issue on appeal.

VI.

TPG argues that an award of compensatory damages is not warranted both because it did not intentionally discriminate against Ferrill and because Ferrill adduced insufficient proof of actual harm. As previously discussed, this Court affirms the District Court's finding that TPG knowingly and voluntarily treated Ferrill differently according to race, that is, that TPG engaged in intentional discrimination in violation of § 1981. This Court also affirms the jury's reasonable determination that Ferrill suffered compensable damages in the amount of $500.

Although compensable damage must be proven, *see Carey v. Piphus,* 435 U.S. 247, 263-64, 98 S.Ct. 1042, 1052-53, 55 L.Ed.2d 252 (1978), general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity. Compensatory damages "may be inferred from the circumstances as well as proved by the testimony." *Id.* (quoting *Gore v.Turner,* 563 F.2d 159, 164 (5th Cir.1977)). *See also H.C. by Hewett v. Jarrard,* 786 F.2d 1080, 1088 (11th Cir.1986) (same). Ferrill's testimony that the terms, conditions, and privileges of her employment were adversely affected by TPG's disparate treatment of employees on the basis of race was sufficient evidence of harm. Any evidentiary shortcomings "go more to the amount, rather than the fact, of damage," *Marable v. Walker,* 704 F.2d 1219,1220 (11th Cir.1983), and were considered by the jury when it decided that $500 would compensate Ferrill for her injuries.

The amount of Ferrill's damages properly included recovery for her emotional harms. A plaintiff may be compensated for intangible, psychological injuries as well as financial, property, or physical harms. *See Carey,* 435 U.S. at 263-64, 98 S.Ct. at 1052-53. *See also Marable,* 704 F.2d at 1220 (holding that plaintiff's own testimony that he was embarrassed and humiliated by defendant's conduct was sufficient to

support compensatory damages award). The Supreme Court has indicated that a plaintiff may recover for emotional harm under § 1981. *See Johnson,* 421 U.S. at 460, 95 S.Ct. at 1720. Ferrill testified that she was humiliated by TPG's physical separation of employees on the basis of race and by TPG's allocation of work and scripts according to race. Humiliation and insult are recognized, recoverable harms. *See, e.g., Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927 (5th Cir.1996), *cert. denied,* 519 U.S. 1091, 117 S.Ct. 767, 136 L.Ed.2d 713 (1997); *Marable,* 704 F.2d at 1220.

The standard of review for awards of compensatory damages for intangible, emotional harms is "deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses." *P.H.P. Healthcare Corp.,* 90 F.3d at 937-38. Once a defendant is found liable for the plaintiff's injury, the District Court has a great deal of discretion in deciding the level of damages to be awarded. *See Stallworth,* 777 F.2d at 1435. When an award of damages has been reviewed and upheld by the trial judge, it is entitled to a presumption of validity. *See, e.g., Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 421, 114 S.Ct. 2331, 2335, 129 L.Ed.2d 336 (1994). Accordingly, this Court defers to the findings below that Ferrill suffered injury compensable in the amount of $500.

VII.

TPG also contends on appeal that punitive damages are not warranted and alternatively that, given the circumstances of this case, $4000 is an excessive amount. Because we find on these facts that punitive damages are not warranted, we do not reach the second issue.

Under § 1981, punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1628, 75 L.Ed.2d 632 (1983). "Punitive damages are disfavored by the law and are awarded solely to punish defendants and deter future wrongdoing." *See Walters v. City of Atlanta,* 803 F.2d 1135, 1147 (11th Cir.1986).

11

To support a punitive damages award, a plaintiff must show that the defendant acted with malice or reckless indifference to the plaintiff's federally protected rights. *Reynolds v. CSX Transportation, Inc.,* 115 F.3d 860, 869 (11th Cir.1997). Malice means "an intent to harm" and recklessness means "serious disregard for the consequences of [one's] actions." *Splunge v. Shoney's, Inc.,* 97 F.3d 488, 491 (11th Cir.1996) (quotation omitted). *See also Walters,* 803 F.2d at 1147 (defining the standard as "cynical disregard").

Although the evidence shows that TPG intentionally discriminated on the basis of race in job assignment, the District Court specifically found that TPG lacked any racial animus. Thus, the evidence is insufficient to find that TPG acted with the requisite malice or reckless disregard of Ferrill's federally guaranteed rights.

VIII.

This Court affirms the District Court's finding that TPG intentionally discriminated on the basis of race in violation of § 1981. In addition, we affirm the award of compensatory damages in the amount of $500. However, because the record is devoid of evidence of the ill will required to support the imposition of punitive damages, we reverse on that issue.

AFFIRMED in part and REVERSED in part.

12