[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 07-15102
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 17, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-03252-CV-TCB-1

CHET GRIMSLEY,

Plaintiff-Appellant,

versus

MARSHALLS OF MA, INC.,
TJX COMPANIES, INC.,
DAVID FARRY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 17, 2008)**

Before TJOFLAT, BLACK and HULL, Circuit Judges.

PER CURIAM:

Plaintiff Chet Grimsley appeals the district court's grant of summary judgment in favor of his former employer, Marshalls of MA, Inc., its parent company, TJX Companies, Inc., and his former supervisor, David Farry, (collectively referred to as "Marshalls") on his claims of race discrimination under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. § 1981, prohibited medical inquiry under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and intentional infliction of emotional distress and negligent supervision/retention under Georgia law. After review, we affirm.

## I. BACKGROUND

### A. Grimsley's Employment at Marshalls

Grimsley worked at a Marshalls warehouse as a night-shift shipping supervisor. The warehouse had approximately 900 employees and was about 800,000 square feet in area. Grimsley supervised between thirty and sixty employees who sorted and loaded trucks with merchandise to be shipped to stores. Grimsley was one of two white supervisors who worked at the warehouse. The

other white supervisor was Michael Love. The remaining supervisors and most of the warehouse employees were black.[1]

From 1999 until 2004, David Farry, a white processing manager, was Grimsley's supervisor. Grimsley and Farry had been close personal friends and had worked together at Marshalls in the past. However, beginning in 2000, Farry's treatment of Grimsley became abusive and forms the basis for Grimsley's claims.

As to his race claim, Grimsley presented evidence that Farry was reluctant to interact with black employees and supervisors under Farry's supervision. Rather than communicate directly with black employees and supervisors, Farry would tell Grimsley to pass on instructions to them. To some warehouse employees, it appeared that Farry was uncomfortable working with or was scared of black people.

Some employees overheard Farry make racist comments. Chris Almond overheard Farry (1) state that he would not let two black employees drive a truck together and (2) refer to one black supervisor as a "GED Nigger." Several

---

[1]Marshalls' warehouse employees were not only African American, but also from various other nationalities and/or ethnic groups, including Somalians, Ethiopians and Sudanese.

3

employees heard Farry refer to the Somalian employees as "lazy Somalians" and to black employees as "lazy niggers."

Grimsley, a white supervisor, presented evidence that Farry treated him differently than the black warehouse supervisors. For example, Farry would yell and curse at Grimsley, make Grimsley work through his breaks and lunch and tell Grimsley to perform manual labor tasks usually reserved for the hourly employees, such as sweeping the floor or retaping lines on the floor.

Farry sometimes required Grimsley to stay late or work on weekends to clean up the areas of black supervisors. One black employee, Belinda Reid, testified that, instead of disciplining black supervisors who left their areas messy, Farry would make Grimsley clean their areas. Several employees reported seeing Grimsley sweeping black supervisors' areas, including an area called the hi-bay that was as large as a football field. These employees testified that they did not see other supervisors sweeping and that this was a job usually reserved for hourly associates. Several employees observed that Farry allowed black supervisors to take long breaks.

Besides Grimsley, the only other white warehouse supervisor under Farry's supervision was Michael Love. Farry assigned Love and Grimsley more work than the black supervisors. Love said that although both he and Grimsley worked

4

harder than black supervisors, Farry "reserved his harshest treatment" for Grimsley. According to Love, Farry made Grimsley perform extremely hard physical labor or perform tasks alone that actually required multiple people. When Love asked Farry why he worked him (Love) and Grimsley harder, Farry would reply that the "black guys won't do any work" and "the niggers are lazy." Farry told Grimsley that he had to do additional work because "I can't get those lazy niggers to work." On one occasion, Farry required Grimsley and Love to get on their hands and knees and tape the warehouse floor. Love asked Farry why they were taping the floor in other supervisors' areas. Farry responded that the "niggers" were "too lazy" and "too stupid" to do it right.

In one confrontation, Farry told Grimsley they were not meeting production standards and Farry believed he was going to get a bad review and lose his bonus. Farry yelled at Grimsley. Among other things, Farry told Grimsley that, because Grimsley was white, he was supposed to do better and that he was not "one of the lazy Niggers like the rest of the people . . . ."

According to Grimsley, when senior management visited the warehouse, Farry would tell Grimsley and Love to sweep other black supervisors' areas. When they asked why they were having to do the black supervisors' work, Farry said it was because the black supervisors were lazy. Grimsley complained to Farry

5

that he was tired of doing the black supervisors' work because Farry "was scared to put them into a position where they were held accountable." Grimsley repeatedly told Farry that Farry needed to hold his black supervisors accountable and that Farry's treatment was race discrimination.

Grimsley testified that "lazy" was Farry's favorite word and that he referred to employees as "lazy Somalians," "lazy Muslims," and "lazy Niggers." Farry referred to the black employees as "Niggers" about once a week. Farry also called Grimsley a "lazy White boy" six or seven times.

Farry also made comments about Grimsley's bi-polar disorder. For example, Farry joked in employee meetings that he hoped Grimsley had taken his medication, called Grimsley crazy and advised Grimsley to "double up" on his "fucking medication" in front of other employees. Farry frequently asked Grimsley whether he was taking his medication, particularly when Farry was not satisfied with Grimsley's work performance.

In October 2004, Grimsley could not tolerate Farry's treatment any longer and resigned.

**B.     District Court Proceedings**

Grimsley filed this action alleging race discrimination under Title VII and § 1981, disability discrimination under the ADA, intentional infliction of emotional distress and negligent supervision and retention under Georgia law.[2]

Following extensive discovery, Marshalls moved for summary judgment on all claims. The magistrate judge's report ("R&R") recommended that summary judgment be granted in favor of Marshalls.

As to Grimsley's claim of disparate treatment based on race, the R&R concluded that Grimsley presented no direct evidence of race discrimination and failed to establish the adverse-employment-action element of the prima facie case using circumstantial evidence. As to Grimsley's ADA claim of a prohibited medical inquiry, the R&R concluded that the ADA had not been violated because Grimsley voluntarily disclosed his bipolar disorder. As to the Georgia law claims, the R&R concluded Farry's conduct toward Grimsley was not sufficiently

_____

[2]The facts in the light most favorable to Grimsley do show a racially-charged workplace. However, Grimsley did not complain or use any of the many available outlets for complaining, including Marshalls' telephone hotline. Thus, the district court granted summary judgment as to Grimsley's racial harassment claim based on the Faragher/Ellerth defense.

Grimsley's complaint contained thirteen counts. On appeal, Grimsley does not challenge the district court's entry of summary judgment on his claims of: (a) racially hostile work environment under Title VII and § 1981 (Counts 2 & 3), (b) hostile work environment and constructive discharge religious discrimination under Title VII (Count 4), (c) hostile work environment disability discrimination under the ADA (Count 10), (d) age discrimination under the Age Discrimination in Employment Act (Count 8), and (e) retaliation for complaining about religious, race, age and disability discrimination (Counts 5, 6, 7, 9, 11). We do not address these claims further.

7

egregious "to meet the high threshold of outrageousness" to sustain a claim of intentional infliction of emotional distress and Grimsley failed to present sufficient evidence that Marshalls was on notice of Farry's propensity to engage in the challenged conduct to survive summary judgment on his negligence claim.

Grimsley filed objections to the R&R. The district court adopted the R&R as to the claims of intentional infliction of emotion distress and negligence. As to Grimsley's disparate treatment, race discrimination claim, the district court concluded Grimsley presented direct evidence of discriminatory intent. Nonetheless, the district court granted summary judgment because Grimsley failed to show he suffered an adverse employment action.

As to Grimsley's ADA claim for prohibited medical inquiries, the district court agreed with the R&R's conclusion that Grimsley's voluntary disclosure of his bipolar disorder precluded recovery. However, the district court cited Grimsley's failure to plead this claim in his complaint as "a more fundamental reason" to grant summary judgment.

Grimsley timely appealed.[3]

---

[3]We review <u>de novo</u> a district court's grant of summary judgment, applying the same standards as the district court. <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1367 (11th Cir. 1999). Summary judgment is appropriate if, construing the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>Id.</u>

## II. DISPARATE TREATMENT RACE DISCRIMINATION CLAIM

Under Title VII it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). The elements of a § 1981 race discrimination claim in the employment context are the same as a Title VII disparate treatment claim. Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 843 n.11 (11th Cir. 2000).[4] On appeal, the parties do not challenge the district court's conclusion that Grimsley presented direct evidence of intent to discriminate based on race and, thus, we do not address that issue.

### A.    Adverse Employment Action Requirement

In order to establish a disparate treatment race claim, a plaintiff must also show that an adverse employment action was taken against him "regardless of whether he is relying on direct evidence of discrimination or employing the burden-shifting approach . . . for cases in which only circumstantial evidence is available." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 n.34 (11th

---

[4]Section 1981 makes it unlawful to discriminate on the basis of race in the making and enforcing of contracts. 42 U.S.C. § 1981(a). The phrase "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all the benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b).

Cir. 2001). Although an adverse employment action need not be an ultimate employment decision, such as termination, failure to hire or demotion, it must meet a "threshold level of substantiality." Davis v. Town of Lake Park, 245 F.3d 1232, 1238-39 (11th Cir. 2001) (quotation marks omitted). Although evidence of "direct economic consequences" is not always required, "to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment." Id. at 1239. The employee's subjective perception of the seriousness of the change is not controlling; rather this issue is viewed objectively from the perspective of a reasonable person in the circumstances. Id.[5]

The Davis court recognized that a change in work assignments could amount to a "substantial and material" change in the terms, conditions or privileges of employment in "unusual instances" and cited as an example McNely v. Ocala Star-Banner Corporation, 99 F.3d 1068 (11th Cir. 1996). Id. at 1245. In

---

[5]We reject Grimsley's argument that the decision in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006) applies to claims of disparate treatment discrimination. The "materially adverse" standard in Burlington Northern was explicitly limited to claims brought under Title VII's anti-retaliation provision, and the Supreme Court was careful to note that a different standard applied to substantive claims of discrimination. See id. at 67, 126 S. Ct. at 2414 (concluding that "Title VII's substantive provision and its anti-retaliation provision are not coterminous," and that the anti-retaliation provision forbids conduct not prohibited by the anti-discrimination provision). Therefore, we continue to apply the standard articulated in Davis to claims of substantive discrimination under Title VII.

McNely, a supervisor at a newspaper was reassigned the duties of a janitor, including cleaning bathrooms, and then transferred to the shipping department, where he was required to perform physically strenuous tasks. See McNely, 99 F.3d at 1078. The Davis court noted, however, that '[i]n the vast majority of instances, . . . an employee alleging a loss of prestige on account of a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause–especially where, as here, the work assignment at issue is only by definition temporary and does not affect the employee's permanent job title or classification." Davis, 245 F.3d at 1245.

The district court found that Grimsley's evidence showed he was subjected to an increased workload, denied breaks while black supervisors were not, and forced to perform certain manual labor outside his job description. However, applying the standard in Davis, the district court concluded that this "unfair treatment does not, under Eleventh Circuit precedent, constitute the type of 'adverse employment action' necessary to support a disparate treatment claim."

Grimsley argues that he was not required to show an adverse employment action because it is undisputed that Farry's job assignments were based on race. As support for his contention, Grimsley relies heavily on Ferrill v. The Parker

11

Group, Inc., 168 F.3d 468 (11th Cir. 1999). Ferrill, however, is not instructive because it does not even mention, let alone address, the adverse employment action element of a disparate treatment claim. Instead, Ferrill focuses on the intent element of a disparate treatment claim.[6] See Ferrill, 168 F.3d at 472-73. Although Ferrill states that "an employee who adduces direct evidence of disparate treatment on the basis of race makes out a prima facie case of intentional discrimination," id. at 472, we do not read this language to eliminate the requirement that the employee show he or she suffered an adverse employment action.

## B. Grimsley's Job Assignments

Alternatively, Grimsley argues that the job assignments Farry gave him were sufficiently substantial and material to constitute adverse employment actions. We disagree. Although Grimsley's workload sometimes increased and he was occasionally assigned additional tasks, these kinds of temporary assignments, without a change in compensation or position, do not amount to a "serious and material change in the terms, conditions, or privileges of employment." See Davis, 245 F.3d at 1239 (emphasis omitted). We cannot say, under the circumstances, that Farry's sporadic assignment of additional tasks to Grimsley

---

[6]The plaintiff in Ferrill sued under only § 1981. Ferrill 168 F.3d at 471. However, as Ferrill notes, the analysis for a disparate treatment claim based on race is the same under § 1981 and Title VII. Id. at 472.

outside his job title caused Grimsley any tangible harm or was an "unusual instance" in which a change in work assignments is sufficiently material and substantial to constitute an adverse employment action. Accordingly, the district court properly granted summary judgment on Grimsley's disparate treatment race discrimination claims under Title VII and § 1981.

### III. ADA Claim

The ADA prohibits an employer from "requir[ing] a medical examination" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The ADA also requires an employer to keep confidential any information about an employee's medical condition or history gleaned from a permissible medical examination or inquiry. 42 U.S.C. § 12112(d)(3)(B), (d)(4)(C). However, when an employee voluntarily discloses this information to the employer rather than provides it to the employer in response to a permissible inquiry or examination, the employee cannot establish an unlawful disclosure under the ADA. See Cash v. Smith, 231 F.3d 1301, 1307 (11th Cir. 2000).

Grimsley argues that the district court erred in concluding that his voluntary disclosure of his bipolar disorder to Farry preluded his ADA claim. Grimsley argues that his claim is a prohibited medical inquiry claim pursuant to § 12112(d)(4)(A) and not a unlawful disclosure claim pursuant to § 12112(d)(3)(B), and that only the latter is precluded by a voluntary disclosure. We need not address this issue, however, because we agree with the district court's alternative ground for granting summary judgment on this claim, that is, that Grimsley did not properly plead this claim in his complaint.

Federal Rule of Civil Procedure 8 requires a complaint to contain "a short and plain statement" of each claim showing that the plaintiff is entitled to relief. Fed. R. Civ. P. 8(a)(2). "The point is to give the defendant fair notice of what the claim is and the grounds upon which it rests." Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 974 (11th Cir. 2008) (quotation marks omitted). In addition, Rule 10 requires each claim founded on a separate transaction or occurrence to be stated in separate counts if needed for clarity. Fed. R. Civ. P. 10(b).[7] "These rules work together to require the pleader to present his claims

---

[7]In December 2007, Rules 8 and 10 were amended as part of a general restyling of the Federal Rules of Civil Procedure. These amendments did not change the substantive requirements of Rules 8 and 10. Fed. R. Civ. P. 1, 8 & 10 advisory committee notes to 2007 Amendment.

discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not." Davis, 516 F.3d at 980 n.57 (quotation marks omitted).

Grimsley's complaint contained only two counts alleging ADA violations, one retaliation count and one discrimination count.[8] The discrimination count, Count 10, reincorporated all thirty-five factual allegations in the complaint by reference.[9] The next five paragraphs of Count 10, paragraphs 57 through 61, alleged that Grimsley had a "disability" as defined under the ADA, was able to perform the essential functions of his job with or without accommodation and that he was a "qualified individual with a disability" under the ADA. Paragraph 62

---

[8]The complaint also alleged an ADA retaliation claim, which is not at issue in this appeal.

[9]One of those thirty-five paragraphs of factual allegations was paragraph 19, which alleged that "[w]hen Farry wanted to criticize Plaintiff's performance, he would routinely ask in a demanding tone whether Plaintiff had taken his medication, which is a violation of the Americans with Disabilities Act's prohibition of medical inquiries not related to the job." Other paragraphs in the complaint alleged that Farry had denied Grimsley breaks and subjected him to different terms and conditions of employment because of his bipolar disorder, had openly harassed and ridiculed Grimsley based on his bipolar disorder, had repeatedly screamed at Grimsley to take his "damn medication" or "double-up" on his medication in front of subordinates, had discussed Grimlsey's bipolar disorder in front of others and had deliberately attempted to humiliate Grimlsey to try to "throw Plaintiff into a manic phase" so that Grimsley would work harder.

15

alleged that the defendants had created a hostile work environment based on his disability, as follows:

> Defendants' harassment of Plaintiff and their subjecting Plaintiff to disparate terms and conditions of employment, making repeated public and mean-spirited non-business related medical inquiries of Plaintiff, their repeated disparagement of Plaintiff due to his disability and their constructive discharge of Plaintiff's employment based on his disability created a hostile working environment based on Plaintiff's disability, in violation of 42 U.S.C. §§ 12101, et seq.

Paragraph 63 alleged that "Defendant's actions constituted discrimination" under the ADA for which Grimsley was entitled to relief and the final paragraphs of Count 10 alleged that the defendants' conduct had been willful, wanton and reckless and identified Grimsley's damages.

Under a fair reading of Count 10, the only disability discrimination Grimsley alleged is a hostile work environment claim. Although paragraph 62 mentions "public and mean-spirited non-business related medical inquiries," it does so only as part of a list of conduct the defendants allegedly engaged in to create the hostile work environment. Count 10, as drafted, does not give the defendants fair notice of a prohibited medical inquiries claim under the ADA and is not "a short and plain statement" of such a claim under Rules 8 and 10.

## IV. STATE CLAIMS

16

Although Grimsley presented evidence from which a reasonable jury could conclude that Farry treated him unfairly, verbally abused him and shamelessly presumed on their personal friendship, we agree with the district court that these facts are insufficient to sustain a claim of intentional infliction of emotional distress under Georgia law. Georgia law imposes liability for this tort only for the most extreme forms of conduct, requiring the employer's conduct to have been so outrageous that "the 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim "Outrageous!"'" Yarbray v. So. Bell Tel. & Tel. Co., 261 Ga. 703, 706 (1991). While Farry's alleged conduct was unprofessional and unacceptable, it does not meet this threshold level of outrageousness.

Furthermore, because Grimsley's underlying claim for intentional infliction of emotional distress cannot survive summary judgment, the district court properly granted summary judgment on Grimsley's derivative negligent retention and supervision claim. See MARTA v. Mosley, 280 Ga. App. 486, 469 (2006) ("A claim for negligent retention is necessarily derivative and can only survive summary judgment to the extent the underlying substantive claims survive the same.").

## V. CONCLUSION

For all these reasons, the district court's grant of summary judgment in favor of Marshalls is affirmed.

**AFFIRMED.**