Nicolette BERNSTEIN, Plaintiff,

v.

SEPHORA, a division of DFS GROUP L.P., DFS Group L.P. and DFS Group Limited, Inc., Defendants.

No. 99–02010–CIV–JORDAN.

United States District Court, S.D. Florida.

Jan. 11, 2002.

William Robert Amlong, Randall Lane Bloom, Amlong & Amlong, Fort Lauderdale, FL, Nicolette Bernstein.

Alvin David Lodish, Sherril May Colombo, Bilzin Sumberg Dunn Baena Price & Axelrod, Miami, FL, for defendant.

## *ORDER ON POST–TRIAL MOTIONS*

GOLDBERG [1], Senior District Judge.

This cause is before the Court upon the three post-trial motions of the defendants (collectively, "Sephora"), and upon the one post-trial motion of the plaintiff ("Bernstein"). Specifically, Sephora moves (1) for judgment as a matter of law under Federal Rule of Civil Procedure 50(b); (2) for a new trial under FRCP 59(a); and (3) for remittitur of the jury's award of $130,500 for damages for emotional pain and mental anguish. Bernstein moves under FRCP 59(a) for a new trial on the issue of damages. For the reasons that follow, the Court denies Sephora's motion for judgment as a matter of law; denies both Sephora's and Bernsteins's motions for a new trial; and grants Sephora's motion for remittitur of the jury's award of damages for emotional pain and mental anguish, which is remitted to $75,000.

## I. BACKGROUND

Bernstein, a female of Jewish ethnicity, was employed by Sephora, owner of a chain of beauty products stores, from July 6, 1998, through February 23, 1999. She instituted this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging racial and religious discrimination, sexual harassment, and retaliation. On February 21, 2001, the Court granted in part and denied in part Sephora's motion for summary judgment, leaving two issues for adjudication: (1)

---

1. The Honorable Richard W. Goldberg, Senior Judge, U.S. Court of International Trade, sitting by designation.

whether Sephora unlawfully discriminated against Bernstein by denying her a promotion to store director at its new location in The Falls because of her race; and (2) whether the denial of that promotion was an unlawful act of retaliation by Sephora against Bernstein because she had previously complained of sexual harassment.

A jury trial commenced on April 26, 2001. At the close of Bernstein's case-in-chief, and again at the close of all the evidence, Sephora moved for judgment as a matter of law, pursuant to FRCP 50(a). The Court denied both motions. Sephora also moved for judgment as a matter of law on the issue of whether Bernstein was entitled to a jury instruction on punitive damages; this motion was granted. On May 1, 2001, after brief deliberation, the jury returned a verdict finding Sephora liable for racial discrimination, but not liable for retaliation. The jury awarded compensatory damages in the amount of $2,000 for lost wages and benefits, and $130,500 for emotional pain and mental anguish. In accordance with the jury's verdict, the Court entered judgment in the amount of $132,500 on May 1, 2001. The four motions that are the subject of this order followed shortly thereafter.

## II. DISCUSSION

### A. Sephora's Rule 50(b) Renewed Motion for Judgment as a Matter of Law

Sephora moves for judgment as a matter of law on the jury's finding that it racially discriminated against Bernstein in violation of Title VII, by denying her the Falls store promotion. In ruling on this motion, the Court must draw all reasonable inferences in favor of Bernstein, the nonmoving party, and the Court may not make credibility determinations or reweigh the evidence. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151, 120 S.Ct. 2097. "A Rule 50(b) motion should only be granted where reasonable jurors could not arrive at a contrary verdict." *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1344–45 (11th Cir.2000) (internal brackets and quotation marks omitted). However, "[a]lthough [the Court] accord[s] substantial deference to the jury's verdict, [it] cannot accord the jury with the benefit of unreasonable inferences, or those at war with the undisputed facts." *McAnally v. Gildersleeve*, 16 F.3d 1493, 1500 (8th Cir. 1994) (internal quotation marks omitted).

#### 1. *Direct evidence analysis*

■ "A plaintiff may establish a Title VII claim through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination." *Bass v. Board of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1103 (11th Cir.2001). A claim based purely on circumstantial, or indirect, evidence of discrimination requires the plaintiff first to establish a prima facie case of discrimination according to the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Bass*, 256 F.3d at 1103–04; *see also infra* Part II.A.2. However, "[i]n cases of discrimination proven by direct evidence, it is incorrect to rely on the *McDonnell Douglas* test because, while circumstantial evidence is used to create

an inference of discrimination under *McDonnell Douglas,* no such inference is required in the case of direct evidence." *Bass,* 256 F.3d at 1104.

In discussing the merits of Sephora's Rule 50(b) motion, the parties to the instant case debate whether Bernstein established a prima facie case of discrimination, thus implicitly[2] presupposing that her claim is predicated only on indirect evidence of discrimination. The Court finds this supposition to be premature. The threshold question is not whether Bernstein has made out a prima facie case, but whether she even has to. The issue is of more than academic interest; if Bernstein's claim is based on direct evidence, the Court must deny Sephora's Rule 50(b) motion. *See Taylor v. Runyon,* 175 F.3d 861, 867 n. 2 (11th Cir.1999) ("Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, [motion for judgment as a matter of law] is not appropriate even where the movant presents conflicting evidence.") (bracketed text in original) (quoting *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir.1997)). Thus, the Court must first resolve whether Bernstein's claim is properly viewed as asserting that there is direct evidence, or merely indirect evidence, of discrimination.

The Eleventh Circuit has described direct evidence as

evidence, which if believed, proves existence of [the] fact in issue without inference or presumption. Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence. In a long line of cases, th[e Eleventh Cir-

cuit] has found direct evidence where actions or statements of any employer reflect[ ] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.

*Merritt,* 120 F.3d at 1189 (final brackets in original; internal citations and quotation marks omitted). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of race ... constitute direct evidence of discrimination." *Bass,* 256 F.3d at 1105 (ellipsis in original; brackets omitted) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999)). Among other things, the statement must "reflect[ ] a discriminatory attitude" and "tie[ ] the discriminatory attitude to the relevant employment decision." *Wright v. Southland Corp.,* 187 F.3d 1287, 1294 (11th Cir.1999). Application of these legal precepts to the facts of a case is not always easy, but the Court believes that in the instant case, Bernstein introduced direct evidence that Mr. de la Hoz entertained a discriminatory attitude that directly animated his role in the denial of Bernstein's promotion. To be sure, Mr. de la Hoz's broad statements of antipathy toward Jews demonstrate only generic prejudice, and would not constitute direct evidence. *See Damon,* 196 F.3d at 1359 (comment that "the company needed ... young men" was not direct evidence of discrimination; although probative circumstantial evidence of the decisionmaker's state of mind, the comment still required an inference that the decisionmaker's desire to promote young men "motivated" his decision to terminate the plaintiff); *Jones v. Bessemer Carraway Med. Ctr.,* 151 F.3d

2. The parties do not actually address the issue, and make no reference to "indirect,"
"circumstantial," or "direct" evidence in such terms.

1321, 1322 n. 1 (11th Cir.1998) (per curiam on petition for reh'g) (noting that statements such as "[y]ou black girls make me sick" and "[y]ou black girls get away with everything" were not direct evidence of discrimination for plaintiff's dismissal).

At trial Bernstein did, however, introduce several pieces of potentially direct evidence. First, Ms. Cogburn testified that Mr. de la Hoz stated that he wanted Bernstein to quit (and she conceded that Mr. de la Hoz "probably" stated that he would make Bernstein miserable enough to quit), in the same conversation that he described Bernstein as a "JAP" ("Jewish American Princess"), a "Jewish bitch," and a "JAP bitch." *See* 1 Trial Tr., at 67–68. Second, Bernstein herself testified that Ms. Cogburn told her that Mr. de la Hoz had told Ms. Cogburn "that of all the races that he hated on the planet, the one that he hated the most were the Jews, and that they had to work together to get rid of that JAP bitch," *see* 2 Trial Tr., at 103–04, and that "[s]he and her princess ways had to go." *Id.* at 110. Mr. de la Hoz's assertions of his intent to drive Bernstein from the workplace and his request for assistance in doing so, made in conjunction with expressions of animosity toward Bernstein's race, and occurring at the same time that Mr. de la Hoz was participating in the promotion decision, demonstrate the close nexus between discriminatory attitude and the complained-of adverse employment action that is required to constitute direct evidence.[3] *See Merritt*, 120 F.3d at 1189–90 (collecting cases where direct evidence found).

There is, however, an additional requirement "[f]or statements of discriminatory intent to constitute direct evidence of discrimination[:] they must be made by a person involved in the challenged decision." *Bass*, 256 F.3d at 1105 (quoting *Trotter v. Board of Trustees*, 91 F.3d 1449, 1453–54 (11th Cir.1996)). "Remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Id.* (internal brackets omitted) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998)). It is undisputed that ultimate responsibility for the promotion decision was officially vested in Ms. Kenney, not Mr. de la Hoz. At the same time, Bernstein argues, as she did before the jury, that the real decisionmaker was Mr. de la Hoz, and that Ms. Kenney was merely a "cat's paw," a conduit for his bias.

Bernstein is correct that where the titular decisionmaker is no more than a cat's paw, courts have looked beyond the formal structure of the decisionmaking process and held defendant companies liable for the invidious bias of the de facto decisionmaker. *See, e.g., Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir.1998) ("In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers."); *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir.1990). However, nearly all such analyses have occurred in the context of a claim based on *indirect* evidence of discrimination. It is not entirely clear that the cat's paw theory should apply where the plaintiff seeks to prevail on the basis of direct evidence of discrimination, insofar as that theory al-

---

**3.** The Court also notes that Mr. D'Annunzio's testimony, as read at trial from the transcript of his deposition, *see* 1 Trial Tr., at 107–08, that Mr. de la Hoz stated at this same time that Bernstein "was a Jewish American Princess who was not productive enough" might also be considered to be direct evidence, as this statement was also made contemporaneously with the promotion decision.

most by definition requires the factfinder to draw inferences,[4] because the drawing of inferences is antithetical to a direct evidence analysis. *See, e.g., Burrell v. Board of Trustees of Ga. Military Coll.*, 125 F.3d 1390, 1393 (11th Cir.1997) ("Direct evidence is evidence, which if believed, proves [the] existence of fact in issue without inference or presumption.") (internal quotation marks omitted). The question, then, is whether the prohibition against inferences extends only to the issue of discriminatory intent, or whether it subsumes the issue of the role that the biased individual played in the adverse employment action. That is, where direct evidence of an individual's discriminatory motive exists, but the question of his role in the decisionmaking process requires an inference to be drawn, may the plaintiff advance her case on a direct evidence theory?

In at least one case, a sister district court within the Eleventh Circuit *has* found direct evidence of discrimination where the plaintiff alleged a cat's paw theory. *See Lewis v. Young Men's Christian Assoc.*, 53 F.Supp.2d 1253, 1260 (N.D.Ala.1999); *see also Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp.2d 1273, 1281–82 (M.D.Ala.2000)

(finding that involvement of bigoted school board member in hiring process, where superintendant was ultimate decisionmaker, did not amount to direct evidence, not because of school board member's status as non-decisionmaker, but because the evidence itself was circumstantial). The *Lewis* court characterized the determination of the identity of the de facto decisionmaker as a simple credibility determination by the jury—much like the direct evidence of discrimination itself, which must still be believed by the jury—rather than as one resting on inferences. *See Lewis*, 53 F.Supp.2d at 1260 ("The foregoing evidence, *if credited*, indicates that Johnson was a decisionmaker. Accordingly, the Court concludes there is direct evidence to support Lewis's ADEA retaliation claim.") (emphasis added; footnote omitted).[5]

In addition, the Court notes that although the Eleventh Circuit has not addressed this issue squarely, indirectly it has suggested that a high degree of specificity is not required on the issue of the biased individual's role in the decisionmaking process, in order to advance on a direct evidence theory. *See Bass*, 256 F.3d at 1105 (finding no direct evidence because allegedly biased individual "was not a member of the interview panel and was

---

4. An inference is "[a] conclusion reached by considering other facts and deducing a logical consequence from them." Black's Law Dictionary 781 (7th ed.1999). With respect to many adverse employment actions, including the one at issue in the case, the precise nature of the decisionmaking process and the relationship between the alleged de facto decisionmaker and the alleged cat's paw will not be unambiguous, but will require some measure of inferences to be drawn. *See, e.g., McDonald v. Rumsfeld*, 166 F.Supp.2d 459, 464 (E.D.Va.2001) ("Under circumstances indicating that the decisionmaker's determination may have been tainted by another supervisor['s] or employee's discriminatory animus toward the plaintiff, it is appropriate *to infer*

the causal connection if the evidence demonstrates that the supervisor or employee possessed leverage, or exerted influence, over the decisionmaker.") (emphasis added).

5. *Cf. Bass*, 256 F.3d at 1111 ("[W]here there is an invalid affirmative action plan in effect relating to the employer's allegedly discriminatory actions, that plan constitutes direct evidence of discrimination if there is sufficient *circumstantial evidence* to permit a jury reasonably to conclude the employer acted pursuant to the plan when it took the employment actions in question.") (emphasis added).

not involved in the selection process"); *Trotter,* 91 F.3d at 1454 (considering, in a direct evidence analysis, whether there was substantial evidence that individual had "anything to do with" employment action). In the instant case, as explained more fully *infra, see* Part II.A.2.c, there is no dispute that Mr. de la Hoz was at least "involved in" the decisionmaking process. Because Bernstein otherwise presented direct evidence of Mr. de la Hoz's discriminatory intent, the Court holds that as a matter of law, there was sufficient evidence of Mr. de la Hoz's involvement in the decisionmaking process such that evidence of his bias constitutes direct evidence of discriminatory intent. As explained in the following section, however, this conclusion is not outcome-determinative; the Court would deny Sephora's Rule 50(b) motion even if Bernstein's case were construed as relying only on indirect evidence of discrimination.

### 2. *Indirect evidence analysis*

Even if Bernstein is deemed to have presented no direct evidence of discrimination, she may still defeat Sephora's motion for judgment as a matter of law by showing that there was sufficient circumstantial evidence of discrimination to support the jury's verdict. Title VII claims supported by such indirect evidence require the application of the three-step burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1258 (11th Cir.2001). Under this framework, Bernstein must first make out a prima facie case of racial discrimination, whereupon the burden of production

shifts to Sephora to articulate a legitimate, nondiscriminatory reason for not promoting her. *See Silvera,* 244 F.3d at 1258. If Sephora does so, the presumption of discrimination created by the prima facie case is rebutted, and Bernstein may attempt to show that Sephora's articulated reason is a mere pretext. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507–12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At all times, Bernstein bears the ultimate burden of persuasion. *See Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *accord Silvera,* 244 F.3d at 1258.

### a. Bernstein's prima facie case

■ The parties do not even agree on the requirements of a prima facie case of discrimination in the failure-to-promote context, which is understandable given that the Eleventh Circuit precedent on point is not a model of consistency. Citing *Lee v. GTE Florida, Inc.,* 226 F.3d 1249 (11th Cir.2000), Sephora claims that Bernstein must prove: "(1) that she is a member of a protected minority; (2) that she was qualified and applied for the promotion; (3) that she was rejected despite these qualifications; and (4) *other equally or less qualified employees* who are not members of the protected minority were promoted." *Id.* at 1253 (emphasis added). Bernstein, however, points to the Eleventh Circuit's prior decision in *Walker v. Mortham,* 158 F.3d 1177 (11th Cir.1998), for the principle that she is not obliged to prove that she is more qualified than the successful promotee, either at the prima facie stage or any other.

The Court agrees that *Walker* controls. In that case, the court considered whether the fourth prong of the prima facie test for a failure-to-promote case requires a plaintiff to show that she is as qualified or more

so than the successful applicant. *See id.* at 1185–93. (The first three prongs of the test recited in *Lee* derives from *McDonnell Douglas,* and are unquestionably correct.) Acknowledging that several of its prior decisions, including *Wu v. Thomas,* 847 F.2d 1480 (11th Cir.1988), had appeared to impose such a requirement, the court proceeded, in a very careful and searching opinion, to find that the plaintiff is not required to make such a showing. Specifically, the court found the comparative qualifications requirement of *Wu* and similar cases to be inconsistent with *Crawford v. Western Elec. Co.,* 614 F.2d 1300 (5th Cir.1980),[6] which had adapted the prima facie test established in *McDonnell Douglas* to Title VII failure-to-promote claims. Under *Crawford,* to satisfy the fourth prong of a the prima facie case the plaintiff need only show that either the employer had filled the position with persons outside the plaintiff's protected class, or that it continued to attempt to do so. *See Walker,* 158 F.3d at 1186 (citing *Crawford,* 614 F.2d at 1315). Applying the "earliest case" rule to resolve this intracircuit conflict, the court held that the *Crawford* formulation of the prima facie test was correct, and that plaintiffs alleging discriminatory failure to promote do not have to show that they were equally or more qualified than other applicants. *See Walker,* 158 F.3d at 1188–93.

Curiously, *Walker* did not settle the issue within the Eleventh Circuit, which has continued to require plaintiffs to show that other candidates for a denied promotion were less or equally qualified, in order to make out a prima facie case under Title VII. *See Taylor v. Runyon,* 175 F.3d 861, 866 (11th Cir.1999) (citing *Wu* ); *Lee* 226 F.3d at 1253 (citing *Taylor* ); *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1339 (11th Cir.2000) (citing *Taylor* ); *Denney v. City of Albany,* 247 F.3d 1172, 1183 (11th Cir.2001) (citing *Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 (11th Cir.1997) (citing *Wu* )). Moreover, although lower courts have applied the *Crawford* formulation of the prima facie test in light of *Walker, see, e.g., Mays v. Union Camp Corp.,* 114 F.Supp.2d 1233, 1238–39 (M.D.Ala.2000), the Eleventh Circuit has yet to do so. While the Court is at a loss to explain the reason for this dissonance, because the Court is persuaded by the careful reasoning of *Walker,* Bernstein need only satisfy the elements enumerated in *Crawford* and *Walker* to make out her prima facie case, *viz.*—(1) that she is a member of a protected minority; (2) that she sought and was qualified for the promotion; (3) that she was rejected in spite of her qualifications; and (4) that Sephora promoted an individual outside Bernstein's protected class, or else continued to attempt to fill the position. *See Mays,* 114 F.Supp.2d at 1239.

Establishing a prima facie case of discrimination is not onerous, *see Crapp v. City of Miami Beach,* 242 F.3d 1017, 1020 (11th Cir.2001) (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089), and Bernstein has done so easily. She is Jewish; she testified that she was qualified and appeared to be so, she was seriously considered as a candidate, and Sephora has not shown in any way that she was not; she did not receive the promotion; and Ms. Pietri, who is not Jewish, did receive the promotion. Sephora's only argument concerning Bern-

---

6. *Crawford,* as a Fifth Circuit opinion handed down prior to October 1, 1981, is binding precedent in the Eleventh Circuit. *See Bon-* *ner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc); *Walker,* 158 F.3d at 1186 n. 17.

stein's prima facie case is that she has not proved that she was as well or more qualified than Ms. Pietri, and as explained *supra*, that argument is not relevant. Thus, Bernstein established a presumption, as a matter of law, that she was not promoted due to unlawful discrimination. In turn, Sephora rebutted Bernstein's prima facie case by introducing evidence that the successful candidate, Ms. Pietri, was well-qualified and was the consensus selection at an informal meeting of Ms. Kenney, Mr. de la Hoz, Mr. Melchor, and Mr. Capecci.

### b. Standard for judgment as a matter of law

The Court must therefore resolve whether there exists sufficient evidence that Sephora's explanation was pretextual to sustain the jury's verdict. As the Supreme Court has instructed:

> Whether judgment as a matter of law is appropriate in any particular [Title VII indirect evidence] case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Bernstein's prima facie case, combined with adequate evidence that Sephora's asserted justification is false, *may be legally sufficient to sustain* the jury's verdict. *Id.* at 148, 120 S.Ct. 2097. However, Sephora "would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for [its] decision, or if [Bernstein] created only a weak issue

of fact as to whether [Sephora's] reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred." *Id.*

### c. Evidence of pretext

■ Sephora makes several arguments in support of its motion. First, Sephora argues that Bernstein's testimony about her own qualifications fails to establish pretext. The Court agrees that the selection of Ms. Pietri over Bernstein does not give rise to an inference of discrimination, but this hardly settles the issue. The question is not "whether the employer selected the 'most' qualified candidate, but only whether it selected the candidate based on an unlawful motive." *Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir.2001). Bernstein is not required to show that she is more qualified than Ms. Pietri, *see Walker*, 158 F.3d at 1192; at most, she "may be forced to address relative qualifications if the defendant presents them to rebut [her] presumption of discrimination." *Id.* at 1193. From the evidence at trial, the jury could have reasonably concluded that Ms. Pietri and Bernstein were roughly equally qualified. Thus, the issue of relative qualifications does not weigh strongly in favor of either party.

Assuming *arguendo* that Mr. de la Hoz was a decisionmaker, Sephora next claims that his discriminatory comments were merely stray remarks and not probative of pretext. This argument is both legally and factually mistaken. As the Eleventh Circuit has observed: "Although we have repeatedly held that [stray] comments are not *direct* evidence of discrimination because they are either too remote in time or too attenuated because they were not directed at the plaintiff, we have not held

that such comments can never constitute *circumstantial* evidence of discrimination." *Ross v. Rhodes Furniture, Inc.,* 146 F.3d 1286, 1291 (11th Cir.1998) (emphasis in original; citation omitted) (reversing district court's grant of employer's Rule 50(b) motion).[7] Sephora's approach would impose an all-or-nothing rule on the evidentiary value of such comments and swallow the distinction between direct and indirect evidence. *See Jones v. Bessemer Carraway Medical Center,* 151 F.3d 1321, 1323 n. 11 (11th Cir.1998) ("Language not amounting to direct evidence, but showing some racial animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case."). Instead, the strayness of the remarks merely goes to the strength of their probative value. In this case, Mr. de la Hoz's comments *were* closely linked both temporally and contextually to the promotion decision, and if they did not rise to the level of direct evidence, they are still highly probative of pretext.

Likewise, the Court cannot overturn the jury's verdict on the basis of the same actor inference, a theory that posits that when the same individual is responsible both for hiring the plaintiff and for taking an adverse employment action against her, a powerful inference exists that the latter action was not pretextual. *See, e.g, Evans v. Technologies Applications & Serv. Co.,* 80 F.3d 954, 959 (4th Cir.1996). Unfortunately for Sephora, the Eleventh Circuit in *Williams v. Vitro Servs. Corp.,* 144 F.3d 1438 (11th Cir.1998) stated that the strength of that inference is for the jury to determine, not the court. *See id.* at 1443 ("[I]t is the province of the jury rather than the court … to determine whether the inference generated by 'same actor' evidence is strong enough to outweigh a plaintiff's evidence of pretext.") Thus, while the jury was entitled to consider the same actor evidence, the Court cannot award judgment as a matter of law to Sephora on the grounds that the jury disregarded the inference thus created.

Sephora's strongest argument is that Mr. de la Hoz, the only individual at Sephora clearly shown to have entertained unlawful bias, was not the decisionmaker. The precise facts surrounding the promotion decision are shrouded, but the evidence put before the jury, viewed in the light most favorable to Bernstein, was that some time during the week of September 13, 1998, during a store directors' conference in San Francisco, a very brief and informal "huddle" took place between Ms. Kenney and Mr. de la Hoz to discuss the selection of the store director for Sephora's new location at The Falls. At some point, Mr. Melchor joined them, as did Mr. Capecci.[8] Mr. Capecci did not testify. Mr. Melchor testified that when he joined the meeting, he was told that Ms. Kenney and Mr. de la Hoz were considering Ms. Pietri for the promotion, that his opinion was sought, and that he voiced his approval. *See* 3 Trial Tr., at 43–48. He was apparently not asked his opinion of Bernstein. Ms. Kenney had only just begun working for Sephora on September 11, 1998, and had never met Bernstein. Bern-

---

7. The Court must follow the teachings of its own circuit court, so Sephora's citation to a Fifth Circuit case, *Rubinstein v. Administrators of the Tulane Educ. Fund,* 218 F.3d 392 (5th Cir.2000), is unavailing.

8. Ms. Kenney testified that Mr. D'Annunzio also participated, but Mr. D'Annunzio claimed that he was not present and that he had no involvement in the promotion decision. *See* 1 Trial Tr., at 110–11. Mr. Melchor also testified that Mr. D'Annunzio was not present. *See* 3 Trial Tr., at 43.

stein introduced into evidence a subsequent memorandum written by Ms. Kenney, stating that the recommendation for the promotion was made by Mr. de la Hoz, and confirmed by positive comments from Mr. D'Annunzio, Mr. Melchor, and Mr. Capecci. *See* 3 Trial Tr., at 163–64. Although Ms. Kenney did interview Ms. Pietri on September 30, 1998, and informed her of her promotion at that time, the promotion decision was acknowledged to have effectively been made at the San Francisco meeting. *See, e.g.,* 1 Trial Tr., at 110–11.

From these facts, the jury could reasonably infer that Mr. de la Hoz was the impetus for the promotion decision, and that Ms. Kenney was a mere cat's paw. *See Christian v. Wal–Mart Stores, Inc.,* 252 F.3d 862, 878 (6th Cir.2001) (reversing judgment as a matter of law for defendant employer where decisionmaker was cat's paw for biased employee, as decisionmaker did not conduct an independent investigation and the employee's influence "may well have been decisive") (quoting *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990)). Moreover, even if the participation of other managers and Ms. Kenney's own interview with Ms. Pietri made her something less than a mere puppet, a reasonable jury could still infer that Mr. de la Hoz so intimately participated in the promotion decision that his bias tainted the result. "Disparate treatment analysis requires that none of the participants in the decision making process be influenced by racial bias. Thus the motivations of both the upper management and of middle management are pertinent." *Anderson v. WBMG–42,* 253 F.3d 561, 566 (11th Cir. 2001) (citations, brackets, and internal quotation marks omitted); *Jones v. Gerwens,* 874 F.2d 1534, 1541 n. 13 (11th Cir.1989) ("If the [decisionmaker] were not motivat-

ed by racial animus but ... [his subordinate] ... consciously recommend[ed] discipline only for blacks, the [decisionmaker's] neutrality with respect to race would not cure [the subordinate's] racial bias, and a claimant could make out a prima facie Title VII disparate treatment claim."). Here, Mr. de la Hoz was one of four participants in a meeting where the promotion decision was made. His participation was "truly direct," *see Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1331 (11th Cir.1999), unlike that of the defendant in *Stimpson,* the case on which Sephora relies, wherein the adverse employment action was made by an independent Civil Service Board. *See id.* at 1331–32.

For all of the above reasons, the jury's verdict was supported by legally sufficient evidence of pretext and was thus not unreasonable. Accordingly, Sephora's motion is denied.

## B. Sephora's Rule 59(a) Motion for a New Trial

Failing the success of its Rule 50(b) motion, Sephora moves for a new trial pursuant to Rule 59(a). Sephora claims that a new trial is the appropriate remedy for the harm it suffered from several instances where Bernstein's counsel disobeyed the Court's evidentiary rulings and attempted to introduce inflammatory evidence. Under Rule 59(a), "[a] new trial may be granted ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted" under the common law. Fed.R.Civ.Pro. 59(a). Among such reasons is the misconduct of trial counsel. *See McWhorter v. City of Birmingham,* 906 F.2d 674, 677–78 (11th Cir. 1990) (affirming trial court's grant of new trial where plaintiff's counsel directly vio-

lated trial court's ruling by arguing previously excluded theory during closing argument).

Sephora argues that it was unfairly prejudiced on three different occasions when Bernstein's counsel tossed, or allowed to be tossed, the proverbial skunk into the jury box[9]: (1) when Bernstein gave a "blow by blow" account of the sexual harassment she allegedly suffered, including a graphic description of physical contact with the intimate parts of her body,[10] in contravention of the Court's unambiguous instruction to Bernstein's counsel to control her witness and not to permit such details to emerge[11]; (2) when Bernstein's counsel asked Mr. de la Hoz to confirm that his appearance as a witness for Sephora was voluntary, in direct violation of the Court's instructions at the pretrial conference; and (3) when Bernstein testified that the store director position required proficiency in Spanish, when the position description Bernstein's counsel was reading merely stated that proficiency in a foreign language was desirable.

The Court agrees that these incidents reflect poorly on Bernstein's counsel—particularly if, as the Court suspects, they were not accidental. Nevertheless, they were not so egregious that a new trial is the appropriate remedy. In every instance, the Court immediately instructed the jury to disregard the offending testimony. To be sure, "curative instructions do not always eradicate the prejudice resulting from an improper argument." *Id.* at 678. In this case, however, none of the incidents was of such monumental significance that it was likely to have contributed appreciably to the jury's verdict. (Notably, Sephora never moved for a mistrial.) The implications of the jury's split verdict are particularly important; presumably, if the jury's passions were truly so inflamed by the lurid testimony of sexual harassment, the jury would have found Sephora liable on the retaliation claim. That it did not do so suggests that the parties had the benefit of a rational and temperate jury that was quite capable of adhering to the Court's limiting and exclusionary instructions. Accordingly, the Court finds that Sephora has failed to demonstrate that a new trial is mandated, and denies the motion.

## C. Bernstein's Rule 59(a) Motion for a New Trial on the Issue of Punitive Damages

■ In ruling on Sephora's Rule 50(b) motion at the close of all the evidence, the Court granted judgment as a matter of law in favor of Sephora on the issue of whether Bernstein was entitled to seek punitive damages. Bernstein now asks the Court to reverse its ruling and moves pursuant to Rule 59(a) for a new trial limited the issue of punitive damages.

A successful Title VII plaintiff "may recover punitive damages ... if the com-

---

9. *See Dunn v. United States,* 307 F.2d 883, 886 (5th Cir.1962).

10. Although Sephora also now objects to the testimony of Dr. Rozynes regarding the same or a similar incident of improper touching, as Bernstein correctly notes, that testimony was elicited by Sephora on cross-examination, and Sephora neither objected nor requested a curative instruction. *See* 2 Trial Tr., at 10.

11. Because Bernstein lost her sexual harassment claim on summary judgment, the incident of sexual harassment was relevant only as background knowledge for the sake of her retaliation claim, and the Court's order *in limine* was intended to avoid confusing or inflaming the jury by excluding the most graphic details about the harassment.

plaining party demonstrates that the respondent engaged in a discriminatory practice ... with malice or with reckless indifference" to the plaintiff's protected rights under Title VII. 42 U.S.C. § 1981a(b)(1) (1994); *accord Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir.1999) ("To support a punitive damages award, a plaintiff must show that the defendant acted with malice or reckless indifference to the plaintiff's federally protected rights."). "[I]n the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Kolstad v. American Dental Assoc.*, 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Although "[a] jury may find reckless indifference where the employer does not admit that it knew its actions were wrong, ... mere negligence as to the civil rights of employees is not enough to justify punitive damages." *U.S.E.E.O.C. v. W & O, Inc.*, 213 F.3d 600, 611 (11th Cir.2000) (citation omitted).

For the same reasons that the Court has previously cited in ruling on this issue, Bernstein's motion must be denied. There is no dispute that Sephora had instituted a genuine anti-discrimination policy, which Mr. de la Hoz violated by taking Bernstein's race into consideration when making his promotion recommendation. The selection of Ms. Pietri rather than Bernstein for the promotion was already a *fait accompli* at the time that Mr. de la Hoz's bias came to the attention of Sephora's upper management, even if the decision had not been formalized. The implication of Bernstein's argument is that when Sephora's upper management learned of Mr. de la Hoz's discriminatory attitude, it should have immediately conducted a sweeping review of *every* managerial decision undertaken by Mr. de la Hoz during his entire tenure at Sephora. Indeed, perhaps Sephora should have done so, but given the compacted time frame of both the ongoing promotional process, necessitated by Sephora's rapid expansion and concomitant need for a store director for its new location at The Falls, as well as Sephora's immediate investigation into Mr. de la Hoz, which resulted in his termination several weeks later, the Court cannot say that Sephora's failure to do so amounted to more than negligence. *Cf. Dhyne v. Meiners Thriftway, Inc.*, 184 F.3d 983, 988 (8th Cir.1999) ("An employer must be allowed some time to gauge the credibility of the complainant and the seriousness of the situation."). Such negligence is not sufficient to impose vicarious liability. *See W & O, Inc.*, 213 F.3d at 611. Because the evidence on this issue is so one-sided that Sephora must prevail as a matter of law, Bernstein's motion for a new trial on the issue of punitive damages is denied.

### D. Sephora's Motion for Remittitur

■ Finally, the Court turns to Sephora's motion for remittitur of the jury's award of $130,500 for damages for emotional pain and mental anguish. The Court "must grant a new trial or remittitur when the award exceeds the maximum limit of a reasonable range within which the jury may properly operate." *Warren v. Ford Motor Credit Co.*, 693 F.2d 1373, 1380 (11th Cir.1982) (internal quotation marks omitted); *see also Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1448 (11th Cir.1985) ("[A] remittitur order reducing a jury's award to the outer limit of the proof is the appropriate remedy where the jury's damage award exceeds

the amount established by the evidence."). "[I]n reaching this determination the Court is not to substitute its judgment for the jury's, and where there is sufficient evidence in the record to support the award, the Court should not reduce merely because it would have found differently." *Moses v. K–Mart Corp.*, 905 F.Supp. 1054, 1057 (S.D.Fla.1995).

To recover more than nominal damages for emotional distress, Bernstein must prove actual injury. *Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *accord Rutstein v. Avis Rent–A–Car Systems, Inc.*, 211 F.3d 1228, 1239 (11th Cir.2000). However, "[a]lthough compensable damage must be proven, general compensatory damages, as opposed to special damages, need not be proven with a high degree of specificity. Compensatory damages may be inferred from the circumstances as well as proved by the testimony." *Ferrill v. The Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir.1999) (citations and internal quotation marks omitted). A plaintiff's own testimony may suffice toward that end. *Id.* "Any evidentiary shortcomings go more to the amount, rather than the fact, of damage." *Ferrill*, 168 F.3d at 476 (internal quotation marks omitted) (affirming damage award of $500) (citing *Marable v. Walker*, 704 F.2d 1219, 1220 (11th Cir.1983)). Because the jury found Sephora liable only on the discrimination claim, and not on the retaliation claim, only damages evidence related to the discrimination claim is relevant. *See Goldstein*, 758 F.2d at 1448 ("Where ... there is only one basis for liability alleged, then all of the damages evidence relates to

that count and the trial court may base a remittitur order on the maximum amount proved.").

The Eleventh Circuit has never precisely delineated the factors that a court should consider in determining whether the plaintiff's evidence of emotional distress is sufficient to support the jury's award of compensatory damages for emotional distress, particularly where the plaintiff's damages evidence consists chiefly of her own testimony. However, in *Price v. City of Charlotte*, 93 F.3d 1241 (4th Cir.1996), the Fourth Circuit conducted what the Fifth Circuit later deemed a "magnum opus," *see Brady v. Fort Bend County*, 145 F.3d 691, 718 (5th Cir.1998), on this very topic.[12] Surveying the practice of its own and other circuits, the *Price* court amalgamated the following factors: (1) whether the plaintiff lost the esteem of her peers; (2) whether the plaintiff suffered physical injury as a consequence of her emotional distress; (3) whether the plaintiff received psychological counseling or other medical treatment; (4) whether the plaintiff suffered a loss of income; (5) the degree of emotional distress; (6) the context of the events surrounding the emotional distress; (7) the evidence tending to corroborate the plaintiff's testimony; (8) the nexus between the challenged conduct and the emotional distress; and (9) any mitigating circumstances. *Price*, 93 F.3d at 1254 (citing, *inter alia*, *Spence v. Board of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986), and *Fitzgerald v. Mountain States Telephone and Telegraph Co.*, 68 F.3d 1257, 1265–66 (10th Cir.1995)).

At trial, Bernstein did introduce the very brief testimony of two of her treating

---

**12.** Although *Price* differs from the instant case in that it concerned the availability of damages for emotional distress resulting from an equal protection constitutional violation, rather than a Title VII violation, the analysis is essentially the same. Indeed, in *Price* the Fourth Circuit relied extensively on its recent decision in *Hetzel v. County of Prince William*, 89 F.3d 169 (4th Cir.1996), a Title VII case.

physicians, Dr. Fuentes and Dr. Rozynes. Dr. Fuentes testified that he treated Bernstein in December 1998 for temporal mandibular joint pain ("TMJ"), a painful condition of the jaw that the doctor testified could be caused by stress, but could also be caused by using the phone, chewing gum, or sleeping incorrectly. *See* 1 Trial Tr., at 85–89. Bernstein never suggested to Dr. Fuentes that work-related stress could have been the cause of her TMJ pain. *Id.*, at 90. Dr. Rozynes testified that he treated Bernstein in October 1999 for her spastic colon, a condition that he had first diagnosed in October 1995, and noted that she suffered from colitis, severe anxiety, and nausea. 2 Trial Tr., at 3–7. Dr. Rozynes did testify that Bernstein stated that harassment, pressure, and prejudice at her workplace were contributing to her tension and anxiety. *Id.*, at 5–6. On Bernstein's next visit to Dr. Rozynes two months later, for treatment of a respiratory infection, Bernstein did not complain of anxiety or nerves. *Id.*, at 10–11.

Primarily, however, Bernstein's evidence on the issue of her emotional distress consisted of her own testimony.[13] She testified that she felt "sick," "angry," "furious," and "upset" upon learning that she had not earned the promotion due to Mr. de la Hoz's anti-Semitism. *See* 2 Trial Tr., at 115–16. She also testified that she was anxious, had trouble sleeping and waking, lost her appetite, could not "find peace" within herself, and was no longer her usual easy-going self. *Id.*, at 116. With respect

to medical ailments, Bernstein testified that she experienced TMJ pain, that she began suffering from gastrointestinal problems while working at her subsequent job at Sonesta Beach Resort in late 1999, and that she was taking medication for her nerves and for her stomach. *Id.*, at 118–19. Bernstein testified that she had visited a psychologist on one occasion in the fall of 1998 and that she would like to visit a therapist again.[14] *Id.*, at 119–20, 123.

In sum, the evidence before the jury of Bernstein's emotional pain and mental anguish consisted of Dr. Fuentes's testimony about her TMJ condition, which was more or less contemporaneous with the discrimination, but for which no causal link was demonstrated; Dr. Rozynes' testimony about her preexisting spastic colon, as well as anxiety and nausea, for which a causal link was claimed, albeit not contemporaneously with the discrimination; and Bernstein's own rather conclusory testimony about her general distress and the fact that she had visited a mental health therapist on one occasion. Taken together, this evidence is fairly weak; the degree of distress, although doubtless significant to Bernstein, is not as strong as in many other Title VII cases, and the nexus between the discrimination and its impact is not close—particularly as Mr. de la Hoz uttered none of his discriminatory comments to Bernstein's face, and she learned of them only after the adverse employment action was effectively made.

Considering the other factors enumerated in *Price*, the Court notes that Bernstein

---

**13.** Not only was the testimony of Bernstein's doctors brief, but tellingly, in her closing argument, Bernstein's counsel devoted only one sentence to the extrinsic medical evidence. *See* 4 Trial Tr., at 34. Moreover, Bernstein's response to Sephora's motion for remittitur, in enumerating the evidence of her damages, refers only to her own testimony about her distress. *See* Pl.'s Response to D.'s Mot. to Remit Jury Verdict Awarding P. Damages for Emotional Distress, at 5.

**14.** Bernstein's testimony that she had visited a second psychologist eight to ten times in 2000 was stricken by the Court, as a sanction for Bernstein's failure to update her deposition testimony. *See* 2 Trial Tr., at 120–23.

did not suffer professionally to any great degree. Although she may have entertained expectations of rapid promotions upon being hired at Sephora, she came to Sephora having been fired from her previous job, and the promotion decision was made after she had been a Sephora employee for only two months. There is no evidence that she experienced significant loss in stature at her job. Nor was she incapacitated in her performance; to the contrary, she testified that she redoubled her work efforts in the months following the promotion decision. *See* 2 Trial Tr., at 115. Likewise, she experienced no difficulty whatsoever in securing better-paying positions after her voluntary departure from Sephora.

"[T]he determination of whether a damages award exceeds a reasonable range should not be made in a vacuum, but should include consideration of the amounts awarded in other, comparable cases." *Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir.1997) (citation and internal quotation marks omitted). Particularly in light of the statutory caps on recovery for punitive and compensatory damages under Title VII, *see* 42 U.S.C. § 1981a (allowing maximum *combined* recovery of $50,000 to $300,000 depending on size of defendant company), an award of $150,000 for emotional distress should be viewed as an upper threshold, up against which Bernstein's award of $130,500 already scrapes. *See Copley v. Bax Global, Inc.*, 97 F.Supp.2d 1164, 1172 (S.D.Fla.2000).

The court finds that under the totality of the circumstances, remittitur is required. Although Bernstein did present some medical testimony to corroborate her claims, it was only partially probative, her own testimony is of limited value, *see Price*, 93 F.3d at 1254–55 (reversing award of compensa-

tory damages for emotional distress in § 1983 challenge to promotion practices at police department, where plaintiffs variously testified that they felt "betray[ed]," "[e]mbarrassed," and expressed surprise that "race was going to play any part" in promotions), and the extent of the discrimination and its impact on her professional life was comparatively limited. The Court is also mindful of the fact that Bernstein's tenure at Sephora was brief, *cf. Mathieu v. Gopher News Co.*, 273 F.3d 769, 782–84 (8th Cir.2001) (declining to reduce award of $165,000 where plaintiff had lost his job of thirty-four years and had been forced to reduce his standard of living, and had become depressed); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1065 (8th Cir.1997) (upholding award of $100,000 for emotional distress in successful failure-to-promote claim, where plaintiff, his wife, and son all testified that he suffered anxiety, sleeplessness, stress, depression, high blood pressure, headaches, and humiliation, after twice being passed over for promotion in favor despite ten years of superior and outstanding performance evaluations), and that her separation was not only voluntary but immediately resulted in a series of higher-paying jobs. For these reasons, the Court finds that $75,000 is the maximum reasonable recovery for the degree of emotional distress and mental anguish that Bernstein has suffered. *Cf. Foster v. Time Warner Entm't Co., L.P.*, 250 F.3d 1189, 1196 (8th Cir.2001) (affirming award of $75,000 where plaintiff's husband testified that she became withdrawn, could not eat, experienced back pain, muscle stress, and stomach problems, but did not seek medical treatment or have difficulty in finding another job); *Saleh v. Upadhyay*, 11 Fed.Appx. 241, 263 (4th Cir.2001) (reducing compensatory award for emotional distress from $150,000 to $75,000 for plain-

tiff subjected to emotional distress from national origin discrimination for a period of four years, but who did not present medical evidence to corroborate his testimony about distress).

"The Seventh Amendment requires, however, that the plaintiff be given the option of a new trial in lieu of remitting a portion of the jury's award." *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1329 (11th Cir.1999) (citing *Hetzel v. Prince William County, Va.,* 523 U.S. 208, 118 S.Ct. 1210, 140 L.Ed.2d 336 (1998)). If Bernstein does not consent to the remittitur, the Court will order a new trial. *See Johansen,* 170 F.3d at 1329. Accordingly, the Court reduces Bernstein's compensatory damages award to $75,000 and grants a new trial nisi remittitur at her option.

### III. CONCLUSION

In sum, it is hereby:

(1) **ORDERED** that the defendants' FRCP 50(b) motion for judgment as a matter of law is **DENIED;**

(2) **ORDERED** that the defendants' FRCP 59(a) motion for a new trial is **DENIED,** subject to plaintiff's acceptance of the Court's order of remittitur;

(3) **ORDERED** that the plaintiff's FRCP 59(a) motion for a new trial on the issue of punitive damages is **DENIED;**

(4) **ORDERED** that the defendants' motion for remittitur is **GRANTED** with respect to the jury's award of compensatory damages for emotional pain and mental anguish;

(5) **ORDERED** that the jury's award for emotional pain and mental anguish is remitted from $130,000.00 to $75,000.00;

(6) **ORDERED** that the plaintiff shall file a notice of acceptance of remittitur

within twenty days of this order, if she accepts the Court's remittitur; and it is further

(7) **ORDERED** that if notice of acceptance of remittitur is not filed within twenty days of the date of filing of this Order, the Court will order a new trial limited to the issue of compensatory damages.