[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-10337
Non-Argument Calendar
_____

D.C. Docket No. 5:17-cv-00380-TES


JOHNNY BLASH,

                                                              Plaintiff-Appellant,

versus

CITY OF HAWKINSVILLE AND PULASKI COUNTY
GEORGIA SHERIFF'S OFFICE, et al.,

                                                              Defendants,

WILLIAM B. CAPE,
Executor of the Estate of Billy Cape deceased,
DANNY BRANNEN,
Individually and in his Official Capacity as Sheriff,
Pulaski County, Georgia,

                                                              Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Middle District of Georgia

———————————————

(April 21, 2021)

Before NEWSOM, GRANT, and ANDERSON, Circuit Judges.

PER CURIAM:

Johnny Blash, who worked as a deputy in the Pulaski County Sheriff's Office, appeals the district court's (1) grant of summary judgment for the defendants on his discriminatory discharge claims against Danny Brannen, in his official capacity as the current Sheriff, and former Sheriff Billy Cape (now deceased) in his individual capacity, and (2) dismissal of his race discrimination claim against Brannen in his individual capacity for failure to state a claim.

I.

Blash, who is African American, worked as a deputy sheriff in the Pulaski County Sheriff's Office from 2010 until he was fired on December 1, 2014 by then-Sheriff Cape, who was Caucasian. Brannen, who is also Caucasian, held the position of Captain at the time and was Blash's supervisor.

Brannen demonstrated racial bias against African Americans by using the word "n***er" to refer to African Americans on several occasions and by making

other racially derogatory comments while on the job at the Sheriff's Office.[1]  For example, during a dispute with an African-American businessman about whether the man had a business license, Brannen said to the man, "You know how you can tell if a black person is lying?"  When the man's wife responded, "How?" Brannen said, "If they are black and moving their lips."

Sheriff Cape was aware of and condoned—or at least tolerated—Brannen's racial bias.  Cape was present on one occasion when Brannen was discussing a call by an African-American civilian and referred to the caller as a "dumbass n***er."  When a deputy who was also present objected to Brannen's racist language, Cape just laughed and Brannen kept talking.  One time, during a "town hall" meeting at a local church, several African-American citizens complained to Sheriff Cape about racist and abusive treatment by Brannen.  Cape generally made excuses for Brannen's racist conduct and language or took Brannen's side in denying that any incidents of discrimination occurred.

Brannen, who as "Captain" supervised all the patrol shifts, allowed his evident racism to carry over into his management decisions.  One deputy overheard Brannen saying that each patrol shift needed to have "one black and one white"

---

[1] Brannen denies making such comments, but at the summary judgment stage we must credit Blash's version of the facts and draw all reasonable inferences in his favor.  *See Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007); *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("[W]hen conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." (emphasis omitted)).

3

deputy, and that there were "too many blacks" on one shift. The same deputy, who is African American, testified that Brannen and Cape "made up" policies and rules as they went along, and that they implemented them in a racially discriminatory way. For example, the African American deputy was not allowed to drive his patrol car home for the first year of his employment, ostensibly because of the distance to his home. But after the Sheriff hired a Caucasian deputy who lived even further away, the rule was changed so that both deputies could drive their patrol cars home.

On one occasion before he was fired, Blash was disciplined more harshly than a Caucasian deputy who committed the same offense. Specifically, the Caucasian deputy used his marked patrol car for personal reasons by driving it to the fairgrounds when he was off duty. He was given a verbal reprimand but was allowed to retain his patrol car without restriction. When Blash similarly used his patrol car for nonwork purposes while he was off duty, Brannen personally went to retrieve the patrol car and Blash was suspended for two days and not allowed to drive his patrol car home for six months.

Aside from the incident with the patrol car, it appears that Blash's work performance was satisfactory, at least until just before Blash was fired. The record contains only one performance evaluation, in which Blash was given a "good" rating in each category of evaluation.

4

In the spring or early summer of 2014, an acquaintance named Scott Orta told Blash that a postal driver had approached him about his pain medication. Though Blash didn't know it, the postal driver, Renee Howard, soon came under investigation by the United States Postal Service and a local drug task force for suspected theft of pharmaceuticals from the mail.

In November 2014, a United States Postal Service inspector met with Sheriff's Office Chief Investigator Robert McGriff and Jay Williams, a Sheriff's deputy who was a member of the drug task force, at the Sheriff's Office to discuss the investigation and plan a coordinated "sting" operation designed to catch Howard. At some point during or after the briefing, McGriff showed Blash a surveillance image of Orta and asked if he knew who he was. Blash identified Orta and surmised that the Sheriff's Office was taking part in an investigation. McGriff did not tell Blash anything about the investigation, and there was no further discussion after Blash identified Orta. Several weeks later, McGriff told Blash that there had been a sting operation involving Howard and that it had been successful. Blash was not advised of any ongoing investigation involving Howard. To the contrary, McGriff indicated to Blash that the operation was over, since they "got" Howard.

Sometime after he believed the investigation involving Howard had ended, Blash encountered Orta and advised him to "stay away" from Howard. According

to Blash and another deputy, it was common practice for law enforcement officers to tell civilian acquaintances to "stay away" from or "be careful of" situations that police were monitoring.

Unbeknownst to Blash, however, Howard had agreed to act as a confidential informant in an ongoing Postal Service investigation after her arrest. Blash's conversation with Orta was reported through a chain of contacts that eventually reached Sheriff Cape:[2] Orta called Howard and told her that a deputy had warned him to stay away from her. Howard called the Postal Service inspector and told him that she was afraid that her status as an informant had leaked and she would not be safe. The Postal Service inspector contacted Deputy Williams and told him to deal with the Sheriff's Office leak or the inspector would "handle it." Williams relayed the inspector's complaint to Major Jason Freemont, and together Freemont and Williams interviewed Orta and then Blash, who freely admitted telling Orta to stay away from Howard. Major Freemont "briefed" Sheriff Cape, and after

---

[2] Blash objects to Deputy Williams's testimony regarding out-of-court statements made to Williams by the postal inspector or by Orta, by Williams to Major Freemont, and by Major Freemont to then-Sheriff Cape. It is true that generally, inadmissible hearsay cannot be considered on a motion for summary judgment. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012). But out-of-court statements that are introduced to show the effect of the statement on the listener, rather than to prove the truth of the matter stated, are not hearsay. Fed. R. Evid. 801(c); *see United States v. Harris*, 886 F.3d 1120, 1129–30 (11th Cir. 2018). Moreover, the district court found that each of the witnesses whose statements Williams reported could be called to testify at trial, and "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones*, 683 F.3d at 1293–94.

meeting with Major Freemont and Captain Brannen to discuss Blash's "fate," Cape told Blash that he could resign or be fired. Blash refused to resign and asked for an independent investigation of his actions. Cape fired him without having an outside agency investigate.

The Sheriff's Office referred the matter of Blash's alleged interference in an investigation to the local district attorney, and Blash was arrested and charged in Pulaski County Superior Court with violation of his oath as a public officer and obstructing the Postal Service inspector in the discharge of his official duties, by providing confidential information in an active case to a potential suspect. The charges against Blash were dismissed in September 2017 on motion of the county district attorney.

Blash filed a complaint with the Equal Employment Opportunity Commission, alleging that although he was told that he had been terminated for interfering with an investigation, he believed that he had been discriminated against because of his race. After receiving his "right to sue" letter from the EEOC, Blash filed this employment discrimination suit against Pulaski County and the Pulaski County Sheriff's Office; Cape, individually; and Brannen, individually and in his official capacity as the current Sheriff of Pulaski County. Blash alleged, essentially, that Captain Brannen was a blatant racist who insisted that Blash be fired, and that the stated reason for his termination was "bogus," given that Blash

7

was unaware of any ongoing investigation and telling civilians that they should stay away from suspected criminals was a "common practice" among officers. He contended, among other things, that Cape fired him because of his race, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964.

On motion of the defendants, the district court dismissed all of Blash's claims for failure to state a claim except for the discriminatory termination claims against Brannen in his official capacity as the current Sheriff and against former Sheriff Cape in his individual capacity. Following discovery, the district court granted summary judgment in favor of the defendants on those remaining claims. Blash now appeals, challenging only (1) the entry of summary judgment for the defendants on his Title VII discriminatory discharge claim against Brannen in his official capacity as the Sheriff of Pulaski County, and his claim against Cape in his individual capacity for discriminatory discharge in violation of 42 U.S.C. § 1981, brought pursuant to 42 U.S.C. § 1983; and (2) the dismissal of his § 1983 race discrimination claim against Brannen in his individual capacity (also premised on a violation of § 1981) for failure to state a claim.

## II.

"We review an entry of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 919 (11th Cir. 2018) (citation omitted); *see Fils v.*

8

*City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). We also review a district court's grant of a motion to dismiss for failure to state a claim de novo, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Butler v. Sheriff of Palm Beach Cty.*, 685 F.3d 1261, 1265 (11th Cir. 2012).

## III.

On appeal, Blash argues that the district court erred in granting the defendants' motions for summary judgment because he proffered sufficient circumstantial evidence to permit a jury to infer that Brannen and Cape acted with discriminatory intent in terminating his employment. We agree, and we therefore reverse the district court's entry of summary judgment on Blash's Title VII claim against Brannen, in his official capacity as the current Sheriff of Pulaski County, and his § 1983 claim against former Sheriff Cape.

Summary judgment is appropriate when the record evidence shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden to identify any portions of the pleadings, depositions, answers to interrogatories, and affidavits demonstrating the absence of a genuine issue of material fact. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir.

2012).  The burden then shifts to the nonmoving party to rebut that showing by producing relevant and admissible evidence beyond the pleadings.  *Id.*

At the summary judgment stage, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Courts must not undertake the jury's function of weighing the evidence, making credibility determinations, or deciding what inferences should be drawn from the facts.  *Id.*; *see Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Summary judgment is appropriate only if a case is "so one-sided that one party must prevail as a matter of law."  *See id.* at 251–52.

Title VII prohibits an employer from discriminating against an employee based on his race, among other protected classes.  42 U.S.C. § 2000e-2(a)(1).  Section 1981 similarly prohibits intentional discrimination based on race in the employment context.  42 U.S.C. § 1981(a); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).  Section 1983, which provides a private cause of action against a state actor who violates federal constitutional or statutory rights, provides the exclusive remedy for a violation of § 1981 by a state actor.  *See* 42 U.S.C. § 1983; *Butts v. Cty. of Volusia*, 222 F.3d 891, 893, 894 (11th Cir. 2000).  To

survive summary judgment on these intentional discrimination claims, a plaintiff must present sufficient evidence to create a triable issue concerning the employer's discriminatory intent.[3] *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Where the plaintiff relies on circumstantial evidence in an employment discrimination claim, he may allow for an inference of discriminatory intent by making out a "prima facie case" of discrimination, as that term is used in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1162 (11th Cir. 2006). Using the *McDonnell Douglas* framework, the plaintiff's prima facie case creates a presumption of unlawful discrimination that may be rebutted if the defendant produces evidence of a legitimate, nondiscriminatory reason for its employment action. *Id.* If the defendant articulates a legitimate reason for termination, the burden shifts back to the plaintiff to show that the employer's proffered reason was really pretext for discrimination. *Id.*

---

[3] For the most part, we use the same legal framework to analyze employment discrimination claims under Title VII, § 1981, and § 1983. *See Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000). But while Blash can succeed on his Title VII claim by proving that his race was a "motivating factor" in the decision to terminate him, his § 1983 claim against Cape requires more—to prevail on a claim that the defendant violated § 1981, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

11

To establish a *McDonnell Douglas* prima facie case of employment discrimination, a plaintiff must show that: (1) he was member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for the job; and (4) his employer treated similarly situated employees outside his class more favorably. *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). The parties here do not dispute that Blash satisfied the first three elements of the prima facie case. But they take opposing positions regarding the fourth element—that is, whether Blash produced evidence showing that "similarly situated" employees outside his protected class were treated more favorably.

Blash's proposed "comparators" are two Caucasian deputies who were accused of using excessive force during their arrest of an African-American man. According to Blash, Sheriff Cape postponed any disciplinary action against the Caucasian deputies until the Georgia Bureau of Investigation completed an investigation into the incident, and the GBI investigation eventually cleared the deputies of the charges against them. The district court found that Blash's proposed comparators were not "similarly situated" for purposes of establishing a *McDonnell Douglas* prima facie case. We agree.

To satisfy the fourth element of the *McDonnell Douglas* prima facie case, a plaintiff must show that he and his comparators were "similarly situated in all material respects." *Id.* at 1224. Although this is a case-specific inquiry, a similarly

12

situated comparator ordinarily will have: (1) engaged in the same basic conduct or misconduct; (2) been subject to the same employment policy, guideline, or rule; (3) had the same supervisor; and (4) shared a similar employment or disciplinary history. *Id.* at 1227–28. Here, Blash was accused of interfering with an ongoing federal investigation by warning a personal acquaintance to stay away from the subject of the investigation and thereby potentially compromising the subject's safety and usefulness as a confidential informant. This conduct is not remotely similar to the Caucasian deputies' alleged use of excessive physical force against a civilian during the course of an arrest.

Blash argues that the Caucasian deputies were valid comparators because they received "better treatment" even though they were accused of a more serious offense. This argument overlooks the fact that the question for purposes of the *McDonnell Douglas* analysis is whether the other employees' alleged misconduct was sufficiently *similar* to his so that the different disciplinary actions they received would give rise to an inference of discrimination. His insistence that the Caucasian deputies' conduct was worse than his merely highlights the fact that their conduct was different—and "[t]reating *different* cases differently is not discriminatory, let alone intentionally so." *Id.* at 1222–23 (emphasis in the original). To make out a prima facie case under the *McDonnell Douglas* framework, the plaintiff and his comparators "must be sufficiently similar, in an

13

objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1355 (2015)). Blash's alleged misconduct was simply too different from that of his proposed comparators to offer a valid comparison, and the district court did not err in concluding that Blash failed to make a *McDonnell Douglas* prima facie case of discrimination. *See id.* at 1224.

But "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith*, 644 F.3d at 1328. A "plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination." *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012). Here, the record contains sufficient evidence to support an inference of intentional discrimination by Blash's employer (the Sheriff's Office), in violation of Title VII, and by then-Sheriff Cape individually, in violation of 42 U.S.C. § 1981.

A.

We begin with Blash's Title VII claim against his former employer, the Sheriff of Pulaski County—currently, Brannen.  A plaintiff may succeed on a Title VII discriminatory discharge claim by proving either that bias against his race or other protected characteristic was the "but-for" cause of his termination—that is, that it was "the true reason for the adverse action"—or that such illegal bias was at least "a motivating factor for" his termination, "even though other factors also motivated the action."  42 U.S.C. § 2000e-2(a)(1), (m); *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).

Blash relies primarily on statements and actions by then-Captain Brannen to support an inference of racial bias, even as he acknowledges that only the Sheriff—Cape, at the time—has the authority to hire and fire Sheriff's deputies.  In some cases, the discriminatory intent of a supervisor who lacks the authority to terminate the plaintiff may be imputed to the employer—if, for example, the decision-making party followed a biased recommendation by the supervisor without independently investigating the complaint, essentially acting "as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus."  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331–32 (11th Cir. 1999).

To establish liability under this theory, the plaintiff generally must prove that the supervisor's discriminatory animus "was an actual cause of the other party's

decision to terminate the employee." *Id.* at 1331. Where the statute giving rise to the cause of action only requires proof that the employee's protected characteristic was a "motivating factor" in the adverse employment decision, liability may be established by showing that (1) the adverse decision is "the intended consequence" of the supervisor's biased report or recommendation, and (2) the supervisor's biased action was "a causal factor" of the decisionmaker's adverse decision. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419, 420 (2011) (discussing "cat's paw" liability in the context of USSERA, a "very similar" statute to Title VII).

The "requirement that the biased supervisor's action be a causal factor of the ultimate employment action incorporates the traditional tort-law concept of proximate cause." *Id.* at 420. "Proximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that [are] too remote, purely contingent, or indirect.'" *Id.* at 419 (alteration in the original) (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). The supervisor's discriminatory act may be a proximate cause of the employment action and expose the employer to liability even if the decisionmaker is not biased and exercises his own judgment in reaching his decision. In that case, the "decisionmaker's exercise of judgment is *also* a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes." *Id.* at 420. An independent investigation by the decisionmaker does not

16

automatically shield the employer from liability, either. The "supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* at 421.

Here, Blash presented sufficient evidence from which the jury could infer that then-Captain Brannen influenced or controlled the decision to terminate Blash's employment, and that racial bias was at least a motivating factor in the decision. Several witnesses testified that Brannen, not Cape, ran the Sheriff's Office, even when Cape was nominally the Sheriff. Witnesses testified that Cape was afraid of Brannen and consistently deferred to him in managing the Sheriff's Office. Brannen changed Sheriff's Office procedures at will, and Cape went along with any policy or discipline that Brannen implemented. Brannen also created the position of Captain (supervisor of all the shift supervisors) for himself, and Cape went along with that too.

Circumstantial evidence also supported a jury inference that Brannen was involved in the decision to terminate Blash's employment, notwithstanding Brannen's own testimony to the contrary. Brannen was Blash's direct supervisor, and Blash testified that standard protocol in the Sheriff's Office was that any recommendation for discharge would be initiated by a deputy's direct supervisor. In their interrogatory responses, the defendants admitted that Brannen met with

Sheriff Cape and Major Freemont "to discuss Plaintiff's fate" just before he was terminated, and Blash testified that Brannen looked "smug and pleased" when Cape told Blash that he was fired.

In addition, a jury could make the reasonable inference that Blash's warning to Orta to stay away from the suspect postal worker, which came to Cape's attention just before he terminated Blash's employment, would not have resulted in Blash's termination if Blash had been white. Blash and former deputy Eddie Nieves testified that it was common practice for law enforcement officers, including (according to Nieves) officers at the "highest levels," to give similar warnings. Chief Investigator McGriff—who was involved in the investigation at issue—and former deputy Anthony Taylor both testified that Blash had done nothing wrong, and Nieves testified that in 15 years of law enforcement in multiple police departments, he had never seen an officer disciplined or terminated for this routine conduct. The fact that the county district attorney voluntarily dismissed the criminal charges arising from Blash's conduct also gives some support to an inference that Blash would have been cleared of any wrongdoing if he had been given the independent investigation that he requested.

Blash also presented evidence supporting the inference that Sheriff Cape would have requested an independent investigation if Blash had been white. Taylor testified that "[w]henever a Sheriff's Deputy had an alleged infraction Billy

18

Cape would call the GBI to investigate." Blash testified similarly that when "Caucasian deputies had been accused of infractions that could have resulted in discharge, any termination decision regarding them had been held in abeyance pending an investigation by the GBI." But Cape did not request an investigation into the allegations against Blash by the GBI or any other outside agency, despite the fact that Blash specifically asked him to do so. And when Taylor questioned Cape about Blash's termination and urged him to "give Johnny Blash a GBI investigation like was routinely done for Caucasian officers," Cape had no meaningful response.

Finally, ample evidence showed that Brannen harbored strong racial animus against African Americans, and that he displayed that animus in performing his duties at the Sheriff's Office. Blash also presented significant evidence connecting Brannen's racism to his personnel management decisions, including one prior disciplinary decision related to Blash specifically. Assuming that the jury makes the inference that Brannen recommended that Blash be terminated, this evidence—coupled with the circumstantial evidence that Blash's warning to Orta ordinarily would not have resulted in his termination—would support the additional inference that Brannen's recommendation was racially motivated.

Putting these pieces together, if the jury makes every reasonable inference and credibility determination and decides every disputed factual question in

Blash's favor—and again, at this stage of the proceedings we must assume that the jury will do so—it could conclude that (1) Blash's warning to Orta to stay away from the suspect postal worker was not a fireable offense, but a common practice among law enforcement officers; (2) given that such warnings were a common practice even among officers at the "highest levels" of the Sheriff's Office, Cape and Brannen were aware of and ordinarily tolerated the practice; (3) Brannen nonetheless recommended that Blash be fired; (4) Brannen's recommendation was motivated by racial animus; and (5) Cape deferred to Brannen's discriminatory recommendation in his decision to terminate Blash's employment, despite knowing that Brannen was racially biased, and under circumstances in which he would not have fired a Caucasian officer without first initiating an outside investigation.[4]  In other words, the jury could find that that the Sheriff's Office was liable under Title VII because Brannen's biased recommendation was intended to cause, and did cause Blash's termination, and because Blash's race was at least "a motivating factor" for his termination.  *See Staub*, 562 U.S. at 419–20; *Quigg*, 814 F.3d at 1235.

---

[4] The defendants argue that even if Brannen did recommend that Blash be fired (which they deny), Cape's offer to allow Blash to resign shows that Brannen's recommendation did not influence Cape's decision.  But this is a distinction that makes no difference—either way, Blash had no option that would have allowed him to maintain his employment with the Sheriff's Office.

B.

The evidence Blash presented was also sufficient to permit a jury to find in his favor on his § 1983 claim against Cape.  To succeed on a § 1983 claim, a plaintiff must prove that the defendant, acting under color of state law, violated a federal constitutional or statutory right.[5]  *See Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1299 (11th Cir. 2007).  Where the defendant's allegedly unlawful action was taken within the scope of his discretionary authority as a government official and the defendant asserts a defense of qualified immunity, the plaintiff must also show that the defendant's conduct violated clearly established law.  *Id.* at 1300.

Here, Blash alleged that Cape violated § 1981, which guarantees that every person shall have "the same right" as white citizens to, among other things, "make and enforce contracts."  42 U.S.C. § 1981(a).  To succeed on his § 1981 claim against Cape in this context, Blash must prove that Cape purposefully discriminated against him, and that Cape would not have terminated his employment if he had been white.  *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020) (explaining that "if the defendant would have responded differently but for the plaintiff's race, it follows that the

---

[5] The defendants do not dispute that Cape was acting under color of state law in his role as Sheriff of Pulaski County, or that his action in firing Blash was within the scope of his discretionary authority as Sheriff.

21

plaintiff has not received the same right as a white person"); *Ferrill*, 168 F.3d at 472. There is no doubt that it was clearly established long before Blash's termination in December 2014 that intentional discrimination in employment decisions based on the employee's race violates federal law. *See, e.g., Ferrill*, 168 F.3d at 472 (citing *Johnson v. Railway Express Agency*, 421 U.S. 454, 459–460 (1975)).

Again, the evidence recounted above would support jury inferences that (1) Cape was aware that law enforcement officers, including officers at the "highest levels" of the Sheriff's Office, commonly warned civilian acquaintances away from suspect situations, and such conduct ordinarily did not result in disciplinary action; (2) if Blash had been white, Cape would have requested an investigation into Blash's actions by an outside agency before subjecting him to discipline or termination; and (3) if Blash had been given the benefit of an independent investigation, as was "routinely done for Caucasian officers," he would have been cleared of any wrongdoing and would not have been terminated. Thus, a reasonable jury could conclude that Cape intentionally discriminated against Blash because of his race in violation of § 1981(a) by firing him without initiating an independent investigation, supporting a verdict in Blash's favor on his discriminatory discharge claim against Cape.

IV.

Turning to the district court's dismissal of Blash's § 1983 claim against Brannen individually, we note that the factual basis for Blash's claims was somewhat different at the pleadings stage.  We have concluded that Blash was able to muster sufficient evidence after discovery to create a triable issue of intentional discrimination and fend off the defendants' motions for summary judgment.  But in ruling on Brannen's Rule 12(b)(6) motion to dismiss, the district court was limited to the facts alleged on the face of Blash's complaint.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1368 (11th Cir. 1997).  And in his complaint, Blash failed to allege facts showing the required causal connection between Brannen's allegedly racist conduct and Cape's decision to fire him.

To comply with Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "Thus, at a minimum, notice pleading requires that a complaint contain inferential allegations

from which we can identify each of the material elements necessary to sustain a recovery under some viable legal theory." *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 684 (11th Cir. 2001). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. And "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

Blash sought to state a § 1983 claim against Brannen individually for a violation of 42 U.S.C. § 1981, which, as we have said, prohibits discrimination on the basis of race in the employment context. *Ferrill*, 168 F.3d at 472. To succeed on a § 1983 claim, a plaintiff must prove that the individual defendant's alleged statutory or constitutional violation caused the alleged harm. *Dixon v. Burke Cty.*, 303 F.3d 1271, 1275 (11th Cir. 2002); *see Iqbal*, 556 U.S. at 676. And the "causal relation does not exist when the continuum between Defendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers." *Dixon*, 303 F.3d at 1275; *see also Comcast*, 140 S. Ct. at 1014 (§ 1981 plaintiff must plead and prove that race was a but-for cause of its injury).

Blash alleged in his complaint that (1) Brannen was employed by the Sheriff's Office as a Captain and Blash's direct supervisor, (2) Brannen made statements showing that he harbored racial animus against African Americans

24

generally and against Blash specifically, (3) Brannen insisted to Sheriff Cape that Blash be fired, and (4) the Sheriff's Office fired Blash without an internal investigation based on charges that would not have been sustained had they been investigated.  Notably, though Blash later produced evidence supporting an inference that Brannen wielded extraordinary influence over Cape in his management of the Sheriff's Office, Blash failed to allege facts that would support such an inference in his complaint.  He did not allege, for example, that Brannen ran the Sheriff's Office, even when Cape was nominally the Sheriff; or that Brannen changed Sheriff's Office policies and made up disciplinary rules at will, and that Cape routinely deferred to Brannen in such matters.  And although he alleged that Brannen "insisted" to Sheriff Cape that Blash be fired, he failed to allege that Brannen's insistence had any effect on Sheriff Cape's decision, let alone that it caused the Sheriff to fire him.  Indeed, Blash also alleged that Sheriff Cape and the County Commissioner informed him that Sheriff Cape had "exclusive authority" to terminate employees of the Sheriff's Office.

These allegations failed to establish the required causal connection between any racially motivated action by Captain Brannen and the Sheriff's termination of Blash's employment.  Because the factual allegations in Blash's complaint failed to raise his right to relief on his § 1983 claim against Brannen "above the

25

speculative level," the district court did not err in dismissing that claim.  *Twombly*, 550 U.S. at 555.

## V.

We conclude that the district court did not err in dismissing Blash's § 1983 claim against Brannen for failure to state a claim because Blash failed to allege facts in his complaint showing the required causal connection between Brannen's alleged racism and Cape's decision to terminate Blash's employment.  At the summary judgment stage, however, Blash presented sufficient circumstantial evidence from which a jury could conclude that his employer's racial bias was "the true reason for the adverse action" against him—or, for purposes of his Title VII claim, that his race was at least "a motivating factor for" his termination—and that Cape failed to accord Blash the same employment rights that he would have granted to a white deputy, in violation of § 1981(a).  *Quigg*, 814 F.3d at 1235; *see Comcast Corp.*, 140 S. Ct. at 1015.  We therefore affirm the dismissal of Blash's § 1983 claim against Brannen, individually, but reverse the summary judgment for the defendants on Blash's Title VII claim against Sheriff Brannen in his official capacity, and his § 1983 claim against Cape in his individual capacity.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**